# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**MARK W. DOBRONSKI**,
an individual,

                Plaintiff,

v.

**FAMILY FIRST LIFE, LLC**,
a Connecticut limited liability company,

**UNITED OF OMAHA LIFE
INSURANCE COMPANY**,
a Nebraska corporation,

**AMERICO FINANCIAL LIFE AND
ANNUITY INSURANCE COMPANY**,
a Texas corporation,

**GREAT WESTERN INSURANCE
COMPANY,** an Iowa corporation,

**YOUR SENIOR CARE INC.**,
a California corporation,

**KHONSAVAN VONGDARA**,
an individual,

**LEWIS JAN FRIEDMAN**,
a/k/a **LUKE FRIEDMAN**,
an individual,

Case No.  **2:22-cv-12039-DPH-JJCG**

Honorable Denise Page Hood
United States District Judge

Honorable Jonathan J.C. Grey
United States Magistrate Judge

1

**SHANNON ADAMS**
a/k/a **CLAUDIA SHANNON ADAMS**,
an individual,

**DONTE C. GRANT**,
an individual,

**OLIVIA PEREZ**,
an individual,

**VANINA E. BONANNO**,
an individual,

**VANESSA ISABEL POWELL**,
an individual,

**EMMANUEL CHIBUZOR IGWEH**,
an individual,

**DARIO JOSEPH WICKHAM**,
an individual,

**BLAKE HUNTER SCHEIFELE**,
an individual,

**PAUL RYAN CHRISTLE**,
an individual, and

**GRETCHEN LOUISE DROUHARD**,
an individual,

Defendants.

_____

## <u>FIRST AMENDED COMPLAINT</u>

NOW COMES the Plaintiff, MARK W. DOBRONSKI, appearing *in propria*

2

*persona*, and for his complaint against Defendants alleges:

1.  This matter arises under the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, *et seq.*, the Michigan Telephone Companies as Common Carriers Act ("MTCCCA"), M.C.L. § 484.101, *et seq.*, the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101, *et seq.*, and the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.901, *et seq.*

## Parties

2.  Plaintiff is an individual, of the age of majority, a citizen of the United States of America, has a place of business and residence in Lima Township, Washtenaw County, Michigan, and has a place of business in the City of Westland, Wayne County, Michigan.

3.  Upon information and belief, Defendant FAMILY FIRST LIFE, LLC ("FFL"), is a limited liability company organized and existing under the laws of the State of Connecticut, with a principal office being located at 80 Norwich-New London Turnpike, Uncasville, Connecticut 06382.

4.  Upon information and belief, Defendant UNITED OF OMAHA LIFE INSURANCE COMPANY ("United") is a life and health insurer organized and existing under the laws of the state of Nebraska, that is qualified to do business and does business in the state of Michigan as an insurance company, and has a resident

agent in the state of Michigan with a registered office located at 2900 West Road, Suite 500, East Lansing, Michigan 48823.

5.   Upon information and belief, Defendant AMERICO FINANCIAL LIFE AND ANNITY INSURANCE COMPANY ("Americo") is a life and health insurer organized and existing under the laws of the state of Texas, that is qualified to do business and does business in the state of Michigan as an insurance company, and has a resident agent in the state of Michigan with a registered office located at 40600 Ann Arbor Road, East, Suite 201, Plymouth, Michigan 48170.

6.   Upon information and belief, Defendant GREAT WESTERN INSURANCE COMPANY ("Western") is a corporation organized and existing under the laws of the state of Iowa, that is qualified to do business and does business in the state of Michigan as an insurance company, and has a resident agent in the state of Michigan with a registered office located at 2900 West Road, Suite 500, East Lansing, Michigan 48823.

7.   Upon information and belief, Defendant YOUR SENIOR CARE INC., ("YSC") is a corporation organized and existing under the laws of the state of California, and has a principal office located at 921 Ormsby Street, Vista, California 92084.

8.   Upon information and belief, Defendant KHONSAVAN VONGDARA

4

("Vongdara") is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 339 Summer Springs Court, Jacksonville, Florida 32225, holds himself out as being a manager for Defendant FFL, and holds himself out as being an agent for Defendants Omaha, Americo, and Western.

9. Upon information and belief, Defendant LEWIS JAN FRIEDMAN ("Friedman") is also known as "Luke" Friedman, is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 609 Hunter Street, Oceanside, California 92058-1606, holds himself out as the owner of Defendant YSC, and holds himself as being an agent for Defendants Americo and Western.

10. Upon information and belief, Defendant SHANNON ADAMS ("Adams"), is also known as Claudia Shannon Adams, is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 2 Blake Drive, Fairfield, Connecticut 06824, and holds herself out as being employed by Defendant FFL and as being an agent for Defendant Americo.

11. Upon information and belief, Defendant DONTE C. GRANT ("Grant") is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 66 Myrtle Avenue, North Plainfield, New Jersey 07060, and holds himself out as an employee of Defendant FFL and an agent for Defendants United

and Americo.

12.  Upon information and belief, Defendant OLIVIA PEREZ ("Perez") is an individual, of the age of majority, is mentally competent, is not in the military service, residents at 801 Felix Avenue North, Lehigh Acres, Florida 33971, and holds herself out as an employee of Defendant FFL and an agent for Defendants United and Americo.

13.  Upon information and belief, Defendant VANINA E. BONANNO ("Bonanno") is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 60 Shale Hill Road, Sussex, New Jersey 07461, and holds herself out as an employee of Defendant FFL and an agent for Defendant United.

14.  Upon information and belief, Defendant VANESSA ISABEL POWELL ("Powell") is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 9051 East Winchcomb Drive, Scottsdale, Arizona 85260-7006, and holds herself out as an employee of Defendant FFL and an agent for Defendant United.

15.  Upon information and belief, Defendant EMMANUEL CHIBUZOR IGWEH ("Igweh") is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 10619 Northwest 43rd Street, Sunrise, Florida

6

33351-8337, and holds himself out as an employee of Defendant FFL and an agent for Defendants Americo and United.

16.   Upon information and belief, Defendant DARIO JOSEPH WICKHAM ("Wickham") is an individual, of the age of majority, is mentally competent, is not in the military service, resides at 517 Ralph Avenue, #2, Brooklyn, New York 11233-4999, and holds himself out as an agent of Defendant Americo.

17.   Upon information and belief, Defendant BLAKE HUNTER SCHEIFELE ("Scheifele") is an individual, of the age of majority, is mentally competent, is not in the military service resides at 227 Sweet Bay Circle, Jupiter, Florida 33458-2819, himself out as a manager at Defendant FFL, and holds himself out as an agent of, *inter alia*, Defendant Western.

18.   Upon information and belief, Defendant PAUL RYAN CHRISTLE ("Christle") is an individual, of the age of majority, is mentally competent, is not in the military service resides at 7843 154th Court North, West Palm Beach, Florida 33418-7364, holds himself out as an employee or agent of Defendant FFL, and holds himself out as an agent of, *inter alia*, Defendants Western and Omaha.

19.   Upon information and belief, Defendant GRETCHEN LOUISE DROUHARD ("Drouhard") is an individual, of the age of majority, is mentally competent, is not in the military service resides at 1300 East Meadowlark Boulevard,

Apartment 32-203 Derby, Kansas 67037-9508, holds herself out as an employee or agent of Defendant FFL, and holds herself out as an agent of Defendant Omaha.

## Jurisdiction

20.  This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

21.  This Court has limited personal jurisdiction over Defendants FFL, United, Americo, Western, and YSC pursuant to M.C.L. § 600.715, as a result of the defendant transacting any business within the state; and/or doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort; and/or contracting to insure any person, property, or risk located within this state at the time of contracting.

22.  In addition, Defendants United, Americo, and Western are each licensed, pursuant to M.C.L. § 500.402, *et seq.*, by the Michigan Department of Insurance and Financial Services ("MDIFS") to act as insurers and to transact insurance in the state of Michigan.

23.  This Court has limited personal jurisdiction over Defendants Vongdara, Friedman, Adams, Grant, Perez, Bonanno, Powell, Igweh, Wickham, Schiefele, Christle, and Drouhard pursuant to M.C.L. § 600.705,  as a result of the defendant transacting any business within the state; and/or doing or causing any act to be done,

or consequences to occur, in the state resulting in an action for tort; and/or contracting to insure any person, property, or risk located within this state at the time of contracting.

24.  In addition, Defendants Vongdara, Friedman, Adams, Grant, Bonanno, Powell, Igweh, Wickham, Scheifele, Christle, and Drouhard each are licensed, pursuant to M.C.L. § 500.1201a, *et seq.*, by the MDIFS to act as insurance producers to sell, solicit, and negotiate insurance in the state of Michigan.

## Venue

25.  Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as the tortious or illegal telephone calls complained of herein were received in this judicial district.

## The Telemarketing Laws

26.  In response to widespread public outrage over intrusive telemarketing calls to homes and businesses, the United States Congress acted to prevent entities, like Defendant, from invading American citizen's privacy and to prevent abusive "robo-calls" by enacting the TCPA.

27.  According to the Federal Communications Commission ("FCC"), "Unwanted calls and texts are the number one complaint to the FCC.  There are thousands of complaints to the FCC every month on both telemarketing and

robocalls."

28.  Congress explicitly found that robo-calling is an invasion of privacy.

29.  In regard to such telephone solicitations, Senator Hollings of South Carolina, the primary sponsor of the bill, explained, "computerized calls are the scourge of modern civilization.  They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall... these computerized telephone calls threaten our personal safety... These machines are out of control, and their use is growing by 30 percent every year.  It is telephone terrorism, and it has got to stop...." See *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 17 FCC Rcd. 17459, 17474, fn. 90 (2002), quoting 137 Cong. Rec. 30,821-30,822 (Nov. 7, 1991).

30.  According to YourMail, Inc., a company which tracks robocall activity and publishes the YouMail Robocall Index, during calendar year 2021 alone, American consumers were bombarded with over 50.5 *billion* robocalls; an average of over 150 robocalls to each man, woman, and child. [Source: www.robocallindex.com ].

31.  In 2021, nearly 1 in 3 Americans say they have fallen victim to a phone scam in the past year, with reported losses to phone scams exceeding $29.8 Billion. [Source:   www.cndb.com/2021/06/29/americans-list-billions-of-dollars-to-phone-

scams-over-the-past-year.html ].

32.   Congress has found that interstate telemarketing fraud has become a problem of such magnitude that the resources of the Government are not sufficient to ensure adequate consumer protection from such fraud.

33.   As a result, in enacting the TCPA, Congress intentionally created a legally enforceable bounty system, not unlike *qui tam* statutes, to incentivize the assistance of aggrieved private citizens to act as "private attorneys general" in enforcing federal law.

34.   The TCPA, at 47 U.S.C. § 227(b), promulgates in relevant part as follows:

> "Restrictions on use of automated telephone equipment
>
> (1)  Prohibitions  It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice— ...
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;
>
> (B)  to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to

11

deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes, is made solely pursuant to the collection of a debt owed to or guaranteed by the United States, or is exempted by rule or order by the Commission under paragraph (2)(B)...."

35.   Pursuant to authority delegated by Congress to the FCC under the TCPA at 47 U.S.C. § 227(b)(2), the FCC has adopted regulations to implement and carry out the TCPA.

36.   The TCPA implementing regulations, at 47 C.F.R. § 64.1200, promulgate in relevant part:

"(a) No person or entity may:

(1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice; ...

(iii) To any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call...

(2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party or the prior express consent of the called party when the call is made

12

by or on behalf of a tax-exempt nonprofit organization, or a call that delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103.

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call;

(i) Is made for emergency purposes;

(ii) Is not made for a commercial purpose;

(iii) Is made for a commercial purpose but does not include or introduce an advertisement or constitute telemarketing;

(iv) Is made by or on behalf of a tax-exempt nonprofit organization; or

(v) Delivers a "health care" message made by, or on behalf of, a "covered entity" or its "business associate," as those terms are defined in the HIPAA Privacy Rule, 45 CFR 160.103...

(d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

(1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.

(2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.

(3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making calls for telemarketing purposes (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. This period may not exceed thirty days from the date of such request. If such requests are recorded or maintained by a party other than the person or entity on whose behalf the telemarketing call is made, the person or entity on whose behalf the telemarketing call is made will be liable for any failures to honor the do-not-call request. A person or entity making a call for telemarketing purposes must obtain a consumer's prior express permission to share or forward the consumer's request not to be called to a party other than the person or entity on whose behalf a telemarketing call is made or an affiliated entity.

(4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. . .

(6) Maintenance of do-not-call lists. A person or entity making calls for telemarketing purposes must maintain a record of a consumer's request not to receive further telemarketing calls. A do-not-call request must be honored for 5 years from the time the request is made. . . ."

37.  The TCPA implementing regulations at, 47 C.F.R. § 64.1601, additionally promulgate in relevant part:

"(e) Any person or entity that engages in telemarketing, as defined in section 64.1200(f)(10) **must** transmit caller identification information.

(1) For purposes of this paragraph, **caller identification information must include either CPN or ANI, and, when available by the telemarketer's carrier, the name of the telemarketer**. It shall not be a violation of this paragraph to substitute (for the name and phone number used in, or billed for, making the call) the name of the seller on behalf of which the telemarketing call is placed and the seller's customer service telephone number. **The telephone number so provided must permit any individual to make a do-not-call request during regular business hours.**

(2) Any person or entity that engages in telemarketing is prohibited from blocking the transmission of caller identification information." [Emphasis added.]

38.  The TCPA, at 47 U.S.C. § 227(b)(3), provides for a private right of action, as follows:

"PRIVATE RIGHT OF ACTION.  **A person or entity** may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State –

15

(A) an action based on a violation of this **subsection or the regulations prescribed under this subsection** to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages **for each such violation**, whichever is greater, or

(C) both such actions.

If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph." [Emphasis added.]

39. Pursuant to Congressional mandate set forth at 47 U.S.C. § 227(c)(1), the FCC adopted regulations establishing a national "do not call" database and prohibiting any person from making or transmitting a telephone solicitation to the telephone number of any subscriber included in such database, which regulations are set forth at 47 C.F.R. § 64.1200(c), and promulgate in relevant part:

"No person or entity shall initiate any telephone solicitation to:...

"(2) A residential telephone subscriber who has registered his or her telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government...."

40. Additionally, the TCPA, at 47 U.S.C. § 227(c)(5), provides for a private

right of action, as follows:

> "Private right of action.  A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in **violation of the regulations prescribed under this subsection** may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—
>
> (A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation,
>
> (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages **for each such violation**, whichever is greater, or
>
> (C)  both such actions.
>
> It shall be an affirmative defense in any action brought under this paragraph that the defendant has established and implemented, with due care, reasonable practices and procedures to effectively prevent telephone solicitations in violation of the regulations prescribed under this subsection. If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph."

41.  The "do not call" proscriptions also are applicable to cellular or wireless telephone numbers, as set forth at 47 C.F.R. § 64.1200(e), which states:

> "The rules set forth in paragraph (c) and (d) in this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers...."

42.   The FCC has declared that telephone subscribers who have listed their wireless telephone number on the national do-not-call list are deemed to be "residential subscribers".  See *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* 18 FCC Rcd. 14014, 14039, ¶ 36 (2003).

43.   The MTCCCA, at M.C.L. § 484.125, promulgates in relevant part as follows:

> "(2) A caller shall not use a telephone line to contact a subscriber at the subscriber's residence, business, or toll-free telephone number to do either of the following: ...
>
> (a) Deliver a recorded message for the purpose of presenting commercial advertising to the subscriber, unless either of the following occurs:
>
> (i) The subscriber has knowingly and voluntarily requested, consented, permitted, or authorized the contact from the caller.
>
> (ii) The subscriber has knowingly and voluntarily provided his or her telephone number to the caller.
>
> (b) Deliver or attempt to deliver intrastate commercial advertising if the caller activates a feature to block the display of caller identification information that would otherwise be available to the subscriber...
>
> (5) A subscriber contacted by a caller in violation of this section may bring an action to recover damages of $1,000.00, together with reasonable attorneys' fees...

18

(9) A caller who violates this section is guilty of a misdemeanor, punishable by a fine of $1,000.00 or imprisonment for 10 days, or both."

44. The MHSSA, at M.C.L. § 445.111a(5), promulgates:

". . . A telephone solicitor shall not make a telephone solicitation to a residential telephone subscriber whose name and residential telephone number is on the then-current version of the federal [do-not-call] list."

45. The MHSSA, at M.C.L. § 445.111b, promulgates in relevant part:

"(1) At the beginning of a telephone solicitation, a person making a telephone solicitation to a residential telephone subscriber shall state his or her name and the full name of the organization or other person on whose behalf the call was initiated and provide a telephone number of the organization or other person on request. A natural person must be available to answer the telephone number at any time when telephone solicitations are being made...."

46. The MHSSA, at M.C.L. § 445.111c, promulgates in relevant part as follows:

"(1) It is an unfair or deceptive act or practice and a violation of this act for a telephone solicitor to do any of the following:...

(f) Fail to comply with the requirements of section 1a or 1b.

(2) ... [A] person who knowingly or intentionally violates this section is guilty of a misdemeanor punishable by imprisonment for not more than 6 months or a fine of not more than $500.00, or both.

(3) A person who suffers loss as a result of violation of this section may bring an action to recover actual damages or $250.00, whichever is greater, together with reasonable attorney fees."

47. Plaintiff's residential and cellular telephone lines have been besieged with telemarketing calls hawking such things as alarm systems, Google listings, automobile warranties, health insurance, life insurance, credit cards, and even financial miracles from God.  Some calls are blatant scams, including calls purportedly from the Social Security Administration, the U.S. Drug Enforcement Administration, and other government agencies, claiming that arrest warrants have been issued against Plaintiff for alleged drug trafficking and money laundering activities.

48. Plaintiff's residential telephone numbers are ***-***-0222, ***-***-1000, ***-***-1212 and ***-***-2424.

49. Plaintiff's cellular telephone number is ***-***-9671.

50. Plaintiff utilizes his cellular telephone primarily for personal, family, and household use.

51. Plaintiff's residential telephone numbers ***-***-1212 and ***-***-2424, and Plaintiff's cellular telephone number ***-***-9671, are each listed on the National Do Not Call Registry maintained by the United States Federal Trade Commission pursuant to 16 C.F.R. Part 310 and have been so listed continuously

since at least December 9. 2004 and at all times subsequent thereto.

52.  Plaintiff's residential telephone number ***-***-0222 is listed on the National Do Not Call Registry maintained by the United States Federal Trade Commission pursuant to 16 C.F.R. Part 310 and have been so listed continuously since at least August 24, 2022 and at all times subsequent thereto.

53.  By listing his residential and cellular telephone numbers on the National Do Not Call Registry, Plaintiff has given constructive notice to the world, including each and every one of the Defendants, that Plaintiff does not wish to receive telephone solicitations or robocalls at his residential and/or cellular telephone numbers.

54.  The FCC has issued a declaratory ruling defining "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the **non-subscriber customary user of a telephone number included in a family or business calling plan**." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, CG Docket No. 02–278, WC Docket No. 07–135, FCC 15–72, 2015 WL 4387780, at *26 ¶ 73 (FCC July 10, 2015) [Emphasis added].

55.  Plaintiff is  a customary user of the called telephone lines, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered

the nuisance and invasion of privacy of same. Thus, Plaintiff has standing to bring this action for alleged violations of TCPA's robocall provisions. See *Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 324 (C.A.3, 2015).

56. At no time relevant hereto has Plaintiff or any other authorized person requested, consented, permitted, or authorized the contact from the Defendant.

57. At no time has Plaintiff provided permission to the Defendant to engage in telephone solicitation with the Plaintiff via telephone.

58. Pursuant to 47 U.S.C. § 217, the act, omission, or failure of any officer, agent, or other person acting for or employed by an common carrier or user, acting within the scope of his employment, shall in every case also be deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

59. Courts are legally bound to give great deference to the FCC's interpretations of the TCPA and its own regulations.

60. The FCC has clarified that sellers may be held vicariously liable for violations of the TCPA by third-party telemarketers that initiate calls to market the seller's products or services, declaring as follows:

> "[A] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call."

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Declaratory Ruling, 20 FCC Rcd 13664, 13667, ¶ 7 (2005).

61.  When considering individual corporate officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA.  *See, e.g., Jackson Five Star Catering, Inc. v. Beason,* No. 10-10010, 2013 U.S. Dist. LEXIS 155985, *10 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participating in or personally authorized the conduct found to have violated the statute.") (internal citation omitted); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D.MD. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

62.  It is well settled under Michigan law that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation.  A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent for the corporation and not on his own behalf.

63.  For each and every call alleged herein initiated to Plaintiff's telephone line,

Plaintiff suffered the injury of invasion of privacy and intrusion on Plaintiff's right of seclusion.

64. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of the occupation of the telephone line by unwelcome calls, making the phone unavailable for legitimate callers or outgoing calls, including emergency calls, when the telephone line was seized by Defendant's calls.

65. For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff. For calls that were answered, Plaintiff had to go to the unnecessary trouble of answering them. Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls. This also impaired the usefulness of these features on Plaintiff's telephone, which features are designed to inform the user of important missed communications.

66. Each and every call placed without consent by Defendants alleged herein to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

67. For purposes of the TCPA, the FCC has defined "willfully or knowingly" to mean that the violator knew that he was doing the act in question, in this case, initiating a telephone solicitation, irrespective of any intent to violate the law. A

24

violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance.

## Allegations Specific to this Complaint

68.  Defendant FFL is in the business of distributing life insurance.

69.  FFL uses a multi-level marketing scheme termed an "Insurance Marketing Organization" ("IMO") that is well-established within the life insurance industry.

70.  Under this model, IMOs contract directly with insurance carriers who then provide life insurance products that are sold through the IMO.

71.  The IMO then employs independent contractors, commonly known as "agents" to who market and distribute the carrier's insurance products to consumers. The IMO then assists by facilitating the entry of a contract between the IMO's several insurance carriers and the agent so that t agent may market the carrier's insurance products.

72.  As in a typical multi-level marketing scheme, agents can recruit other agents to become part of their selling organization at the IMO.  The selling organization above or  beneath a particular agent is commonly referred to, respectively, as that agent's "upline" or "downline."

73.  An enrolled agent is eligible to earn commission's through the IMO's compensation plan for any insurance product that the agent sells, after the IMO first

deducts its commission from the sale of the carrier's products.

74.  The enrolled agent also earns commissions on insurance products sold by the enrolled agent's "downline" agents.

75.  As part of its marketing program, FFL sells telemarketing "leads" to its agents of consumers.

76.  FFL represents to its agents that FFL is a superior IMO over others because it has access to "exclusive," "fresh" leads that are "newly generated" and have "never been used."  Leads, according to FFL, are potential clients who are seeking insurance products.

77.  FFL sells these leads to its agents at a premium price.  Agents will spend hundreds, if not thousands, of dollars purchasing the leads, believing them to be people in dire need of insurance who have yet to be contacted.  Upon information and belief, FFL earns millions of dollars *per week* selling leads to its agents.

78.  In addition to telemarketing leads, FFL also provides its agents with access to automated telephone dialing platforms and services to facilitate telephoning consumers *en masse* to market the IMO's insurance carriers' products.  These automated telephone dialing platforms use a random number or sequential number generator and have the capacity to call persons at random with no human involvement.

79. FFL promotes telemarketing to its agents as being essential if the agents want to be successful in marketing FFL's IMO's insurance carriers' products, and that the "high quality" leads supplied by FFL will facilitate the agent being successful.

80.  Defendant FFL is well aware that the automated telephone dialing platforms and telemarketing activities which it directs its agents to utilize are illegal and violate the TCPA, as Defendant FFL has been haled into various federal district courts by plaintiffs relative to said tortious activity.

81.  Additionally, is well aware of its involvement in illegal telemarketing as FFL has been the subject of numerous complaints to the Better Business Bureau and other consumer oriented agencies regarding the illegal telemarketing engaged in by FFL and its agents.  Examples of such complaints appearing on the BBB web site include:



82. Defendant FFL is well aware that the "high quality leads" which FFL foists upon its agents for money are of dubious quality and, certainly, not supported by any form of prior express written consent from any of the consumers, as FFL has been previously haled into various federal district courts relative to FFL's fraudulent lead practices.

83. Defendant FFL resells the same "exclusive", "high quality" leads to multiple agents, knowingly allowing multiple agents to contact the same consumers to attempt to sell multiple insurance policies.

84. The Federal Trade Commission ("FTC") has issued a cease and desist demand to FFL after determining that FFL has engaged in making unlawful misrepresentations to its prospective agents regarding the FFL business opportunity. See EXHIBIT 1.

85. Defendants United, Americo, and Western (collectively the "Insurance Companues") are insurance companies engaged in providing insurance products to consumers across the United States, and relevant hereto, in particular to consumers in the state of Michigan.

86. The Insurance Companies are insurance carriers who contract with FFL as part of this multi-level scheme.

87.  The Insurance Companies are each well aware that FFL and its agents engage in illegal telemarketing to sell their respective insurance products, but said defendants engage in willful blindness and disregard evidence of said illegal telemarketing as said defendants make substantial income resultant from the aforesaid illegal telemarketing activities.

88.  Indeed, each of the Insurance Companies lend support to the illegal telemarketing activities by giving the agents access to their respective computer systems for purposes of pricing data and entering prospective insureds' application information, as well as the authority to use the company's trademark and service market – all hallmarks of actual authority; and said defendants ratify the illegal telemarketing activities by accepting and processing the applications for insurance so received.

89.  Defendants Vongdara, Adams, Grant, Perez, Bonanno, Powell, Igweh, and Wickham (hereinafter the "Agents") are each either employees or authorized agents of FFL and authorized agents for one or more of the Insurance Companies.

90.  Defendants YSC and Friedman are authorized agents for one of more of the Insurance Companies.

91.  As part of their overall telemarketing program, Defendant FFL and the Agents will outsource their outbound telemarketing to call centers utilizing automated

telephone dialing systems to initiate telephone calls *en masse* to consumers to develop prospective buyers for the insurance products.

92. The fact that many of telephone calls are placed using automated telephone dialing systems is indicated when calls are received with multi-second delays and/or a "boink" or clicking sound is heard before a live telemarketer comes on the line, when the call is simply dead air, and when the caller identification number display is "spoofed" or manipulated to display a false telephone number.

93. These call centers are usually located outside the United States, typically in the Asian continent, and thus usually outside the reach of United States laws and law enforcement authorities.

94. The call centers, in turn, hire individuals to act as lead generators – known in telemarketing parlance as "ropers" – to pre-qualify called consumers as to whether the consumer meets the qualification criteria for specific insurance products.

95. The lead generator or "roper" will engage in deceptive and illegal techniques to solicit consumers, including, *inter alia*: manipulating the caller identification such that the caller cannot be easily identified or called back; identifying with a false or generic-sounding business name; deliberately calling telephone numbers which appear on the National Do Not Call Registry; refusing to provide identifying information to the called party upon inquiry; uttering profanities

30

to or otherwise threatening or harassing the called party if the consumer does not cooperate by expressing interest or providing requested personal information or the called party requests not to be called.

96.  Once a lead generator or "roper" has a consumer who meets the qualification criteria – referred to in telemarketing slang as the "mark" – the lead generator will then live transfer the call to an Agent who will then attempt to close the sale of the insurance product to the consumer.  It is usually only late at this stage that a called party might learn any identifying information as to the source of the telephone call.

97.  FFL, the Agents, and the Insurance Companies all are well aware of the illegal tactics being used by their contracted call centers, but are deliberately indifferent to what is occurring so as to be able to represent that they are "unaware" of the illegal telemarketing conduct.

98.  In the past 12 months alone, Plaintiff has received well over 500 telephone calls from telemarketers who have falsified or "spoofed" their caller identification and who have identify as being with "Senior Benefits", "American Benefits", "Medicare Benefits" or similar generic sounding names, and during which call where Plaintiff was unable to develop the true identify of the ultimately responsible seller.

99.  Because the telemarketers engage in such deceptive practices designed to

conceal their actual identities, Plaintiff has had to engage in various investigative techniques to identify the sources of the telemarketing calls being received.

100. One investigative technique utilized by Plaintiff is termed a "canary trap", wherein Plaintiff provides false, but unique, identifying information during each received call, in particular a unique name.  If and when that unique information surfaces at a later date, a tie-in between the two events, and hence the ability to identify the source call, is able to be made.

101.  As discovery progresses in this case and Plaintiff is able to learn the identity or identities of the call centers that Defendants have utilized to initiate the telephone solicitations, Plaintiff will seek to amend this complaint to add the call centers as additional named defendants.

<u>Call Number 1</u>

102. On July 30, 2021, at approximately 6:47 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-2424.

103.  The caller identification number displayed was 734-419-5984 and the caller identification name displayed was WAYNE MI.

104.  Upon answering the telephone line, Plaintiff observed a 4-5 second delay after saying "hello" before a live telemarketer who identified himself as "John with American Senior Benefits" came onto the line.

105. "John" then proceeded to pre-qualify Plaintiff for a life insurance policy and sought personal information from Plaintiff. "John" already knew Plaintiff's name (Mark Dobronski).

106. The call was then transferred to an individual who identified himself as "Ryan Hensen... a licensed insurance agent in the state of Michigan."

107. "Ryan" then attempted to sell Plaintiff a $20,000 life insurance policy issued by United for a premium of $131.00 per month.

108. "Ryan" then sought Plaintiff's address, date of birth, medical information, driver's license number, and social security number, to which Plaintiff provided controlled (false) information.

109. The call was then transferred to a female telemarketer who identified herself as "Vanina Martin" with "Mutual of Omaha".

110. "Vanina" then went over the information that Plaintiff had provided to "Ryan" earlier. "Vanina" referred to "Ryan" as "Isaac."

111. "Vanina" sought an email address for Plaintiff, to which Plaintiff provided a controlled email address.

112. Immediately after the termination of the telephone call, Plaintiff dialed back the caller identification number displayed (734-419-5984) and received a recording that the telephone number was disconnected.

113.   On July 30, 2021, at 7:37 P.M., Plaintiff received an email at the controlled email address from a Vanina Bonanno which included an application for life insurance with United.  The application had been pre-filled with the controlled information which Plaintiff had provided during Call Number 1, *supra*.

Call Number 2

114.   On August 3, 2021, at approximately 7:02 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-2424.

115.  The caller identification number displayed was 734-434-2391 and the caller identification name displayed was WILLIAM PARTY.

116.  Upon answering the call, Plaintiff observed a 4-5 second delay after saying "hello" when a male voice came on and asked "Hey Mark, how  you doing?"

117.   Plaintiff asked who was calling and the caller identified himself as "Isaac."

118.  Despite Plaintiff inquiring, "Isaac" would not identify what company he was calling on behalf of.

119.  "Isaac" made reference to the life insurance policy which Plaintiff had purchased "last week" and then transferred the call to "Vanina".

120.  "Vanina" then went over the life insurance application which had been

emailed to Plaintiff the previous week.

121.  Plaintiff then confronted "Vanina" regarding the source of the calls, to which "Vanina" indicated that the calls were from "their call center" and their job was to screen calls and forward them to "Vanina."

122.  Upon the termination of the telephone call, Plaintiff dialed the caller identification number displayed (734-434-2391).  The call was answered "Williams Party Store", which is a small mom-and-pop party store located in Ypsilanti, Michigan.  Plaintiff inquired of the person answering whether anyone had called Plaintiff soliciting life insurance to which the person answering stated that they were the only person working at the store and nobody had used the telephone.

<u>Call Number 3</u>

123.  On April 9, 2022, at approximately 1:03 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

124.  The caller identification number displayed was 734-899-2113.

125.  A recorded message from "Brad from U.S. Benefits" was heard which recorded message sought Plaintiff to respond with his age.  Plaintiff responded "67".

126.  The was then transferred to a live telemarketer who began pre-qualifying Plaintiff.  Plaintiff provided the name "Arthur Heaton" to the caller.

127.  After the termination of the call, Plaintiff dialed telephone number 734-

899-2113, which simply rang and was not answered.

Call Number 4

128.    On April 11, 2022, at approximately 5:43 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone number ***-***-1212.

129.  The caller identification number displayed was 734-420-1658 and the caller identification name displayed was PLYMOUTH MI.

130.  Upon answering the call, Plaintiff observed a 4-5 second delay after Plaintiff said "hello", at which time a live telemarketer who identified himself as "John with Life Benefits" came on the line.  The telemarketer then asked for identifying information.  Plaintiff provided the name "Derrick Simpson".

131.  The call was then transferred to a female who stated that she was a "licensed agent" licensed in Michigan, her name was Anna Siago, her call back telephone number was 904-572-1050, and she was an agent for United.  Amongst the information sought by Siago was an email address for "Derrick Simpson", to which Plaintiff provided a controlled email address.

132.  Siago then quoted for and qualified "Derrick Simpson" for a $30,000 life insurance policy.

133.  At the conclusion of the call, Plaintiff dialed back the caller identifcation

number displayed (734-420-1658) and received a recording that the number was disconnected.

134.  On April 11, 2022, at 7:05 P.M., Plaintiff received an email addressed to Derrick Simpson from Kohnsavan Vongdara forwarding an United individual life insurance application for "Derrick Simpson."  The information contained in the application included the personal identifying information supplied by Plaintiff to Siago during the course of Call Number 2.  The application purports to show the signature of "Derrick Simpson" and includes a certification by Vongdara that he "read and explained the terms" to "Derrick Simpson."

135.  Despite diligent search, Plaintiff has been unable to identify any female with the surname "Siago" who is a licensed insurance agent anywhere in the United States and specifically none licensed in Michigan.

136. During the course of discovery, should Plaintiff discover the true identity of "Anna Siago", Plaintiff intends to amend this Complaint to include Siago as an additional defendant.

<u>Call Number 5</u>

137.   On April 12, 2022, at approximately 3:42 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone number ***-***-1212.

138.   The caller identification number displayed was 734-420-1559 and the caller identification name displayed was PLYMOUTH MI.

139.   Upon answering the telephone, there was a "boink" sound followed by a 4-5 second delay before a live telemarketer came on to the line and identified himself as "Benjamin with Senior Benefits."

140.   "Benjamin" asked to speak with "Mr. Simpson."

141.   Benjamin sought personal identifying information from Plaintiff, including age, date of birth, and address.  Benjamin asked Plaintiff to verify that his first name was Derrick.

142.   The call was then transferred to a female telemarketer who identified herself as Olivia Perez, stated that she was a licensed insurance agent, and that she worked for FFL.  Perez then attempted to sell Plaintiff a life insurance policy with Americo and another with United.  Perez provided her telephone number as 904-572-1050, which is a disconnected telephone number.

143.   During the call, Plaintiff inquired about the "guy at the beginning of the call who spoke poor English", to which Perez explained that the male was "our lead generation specialist... his job is to transfer the call to [her]."

144.   At the conclusion of the call, Plaintiff dialed back telephone number 734-420-1559 and received a recording that the number was disconnected.

Call Number 6

145.   On April 19, 2022, at approximately 10:37 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

146.  The caller identification number displayed was 904-453-8842.

147.  Upon answering the telephone line there was a 5-6 second delay before a female telemarketer came onto the line and identified herself as "Olivia" with "Family First Life" and asked for "Arthur Heaton."

148.  During the call, Olivia identified herself as Olivia Perez, and wanted to review a $20,000 life insurance policy.

Call Number 7

149.  On May 26, 2022, at approximately 11:41 A.M., Defendant or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1000.

150.  The caller identification number displayed was 734-911-9748, which is an invalid telephone number.

151.  Upon answering the telephone line there was a 5-6 second delay before a telemarketer came onto the line and identified himself as Mark.

152.  The telemarketer asked pre-qualifying questions, including seeking the

called party's name, to which Plaintiff responded with the name "Alexander Burke."

153. The call was then transferred to a female telemarketer who identified herself as being Vanessa Powell with FFL First Life. Plaintiff was able to elicit the following information from Powell, *inter alia*: her insurance producer number is 19739892, and her cell phone is 760-617-8812. Powell then pitched to Plaintiff an "indexed universal life policy" with United in the amount of $50,000.00.

154. On May 26, 2022, at 12:12 P.M., Plaintiff received an email to Plaintiff's controlled email addressed to Alexander Burke from Powell which included a completed application for life insurance in the name of "Alexander Burke" from United.

Call Number 8

155. On May 31, 2022, at approximately 5:23 P.M., Defendant or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

156. The caller identification number displayed was 734-499-0082, and the caller identification name displayed was "V5311705900022".

157. Upon answering the line, Plaintiff observed a 4-5 second delay, a click, and then a live telemarketer introduced himself as "Zack" with "Senior Benefits."

158. Zack then engaged in pre-qualifying Plaintiff for life insurance. Amongs personal information requested by Zack, Plaintiff provided a "canary trap" name of

"David McAfree".

159. The call was then transferred to a licensed agent who identified herself as "Olivia Perez" of "Family First Life" and located in Jacksonville, Florida.

160. Perez attempted to sell Plaintiff a $$20,000 life insurance policy from Americo.

161. Perez provided her call back number as 904-453-8842, which was later determined to be a non-working telephone number.

162. During the call, Plaintiff confronted Perez regarding the telemarketer who identified himself as Zack who initiated the call, to which Perez responded that the telemarketer works for her company from one of two transfer centers, one located in Pakistan and the other in the Phillipines, and that they utilize a database of all people over the age of 65 and randomly call the telephone numbers of those people.

163. Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (734-499-0082), which was a non-working telephone number.

Call Number 9

164. On June 1, 2022, at approximately 10:33 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

41

165.   The caller identification number displayed was 904-453-8842 and the caller identification name displayed was NO NAME.

166.   Upon answering the telephone line, the telemarketer asked for "Mr. McAfree" and identified herself as "Olivia" with "Family First Life."

167.   Olivia advised that "Mr. McAfree" had been approved for a $20,000 triple indemnity death insurance policy with Americo.

168.   Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (904-453-8842), which was a non-working telephone number.

169.   On or about June 2, 2022, Plaintiff was mailed a life insurance policy issued by Americo to the "canary trap" name of David McAfree.  The copy of the application included therewith purports to show a signature of David McAfree which was allegedly witnessed by Vongdara on May 31, 2022 in Michigan.

<u>Call Number 10</u>

170.   On June 7, 2022, at approximately 12:17 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

171.   The caller identification number displayed was 734-420-1419 and the caller identification name displayed was PLYMOUTH MI.

172.   Upon answering the telephone, Plaintiff observed approximately a five (5) second delay before a live telemarketer came onto the line and identified himself as "James" with "Final Expense" and asked for "Derrick Simpson."

173.   "James" then began to pre-qualify Plaintiff for life insurance.

174.   The call was then transferred to an individual who identified himself as "Chris Martin" with "Family First Life" who stated that he was a licensed insurance agent and continued to pre-qualify Plaintiff.  Plaintiff inquired as to Martin's license number, to which Martin provided the number "M6071217"; upon review the number appears to be false.  Upon inquiry, Martin provided his telephone number as 304-512-0932; dialing back the number merely rings.

175   The call was then transferred to an individual who identified himself as "Jacob Taylor" in the "Final Expense Department", who then began quoting rates for a life insurance policy with Americo.  Plaintiff inquired as to Taylor's license number, to which Taylor responded 19247602; upon review the number appears to be false. Upon inquiry, Taylor also provided his telephone number as 304-449-6165.

176.   Upon termination of the call, Plaintiff dialed back the caller identification number display (734-420-1419), which was a disconnected number.

<u>Call Number 11</u>

177.   On June 16, 2022, at approximately 10:47 A.M., Defendants or

Defendants' agent initiated a call to Plaintiff's residential telephone line \*\*\*-\*\*\*-1212.

178.  The caller identification number displayed was 904-834-8363, and the caller identification name displayed was TECHNFL.

179.  Upon answering the call, the caller asked to speak with "David McAfree" and identified herself as Olivia Perez with Family First Life.

180.  Plaintiff confronted Perez regarding the numerous calls being received. Perez disclosed that her manager is Kohnsavan Vongdara, that they utilize third-party telemarketers located in Asian to transfer calls to Perez, and Perez added that she would make sure to place Plaintiff's telephone number on their do-not-call list.

181.  Immediately after the termination of the call, Plaintiff dialed the caller identification number display (904-834-8363), the call merely rang and went unanswered.

### Call Number 12

182.  On June 23, 2022, at approximately 4:05 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line \*\*\*-\*\*\*-9671.

183.  The caller identification number displayed was 734-330-2168.

184.  Upon answering the call, there was a several second delay before a live telemarketer came onto the line and said "My name is James. How are you? "

185.  James then asked "Is this Mark?" and proceeded to ask Plaintiff several pre-qualifying questions.

186.  James then transferred the call to an individual who identified himself as "Elijah Wood" on the Final Expense Department.

187.  Wood then asked Plaintiff some more pre-qualifying questions and then asked Plaintiff to verify his name and address.  Much to Plaintiff's surprise, Wood Wood recited Plaintiff's true name and true address and asked Plaintiff to verify same.

188.  Wood pressed for some additional personal identifying information from Plaintiff, including date of birth, Social Security Number, height, weight, and credit card number, to which Plaintiff provided controlled *faux* information.

189.  Wood then sold Plaintiff a $5,000 life insurance policy, with a monthy premium of $35.95, to be issued by Western.

190.  Wood represented that he was a licensed insurance agent.

191.  Wood provided his call back telephone number as 918-324-2152.

192.  Wood stated that he worked for "Family First Life."

193.   Immediately after the termination of the call, Plaintiff dialed the caller identification number display (734-330-2168) and received a recorded message that the telephone number was not in service.

194. Plaintiff then dialed the call back telephone number provided by Wood (918-324-2152) and received a recorded message that the telephone number was not in service.

195.  Plaintiff has searched the database of licensed insurance agents and has been unable to find any Elijah Wood licensed as an insurance agent or insurance solicitor in any state.

196.  On June 24, 2022, Western mailed a $5,000.00 life insurance policy to Plaintiff which policy included the "canary trap" information which Plaintiff had provided to Wood.

197.  The selling insurance broker for the life insurance policy is stated as Defendant Scheifele.

198.  The selling insurance agent for the life insurance policy is stated as Defendant Vongdara.

<u>Call Number 13</u>

199. On July 5, 2022, at approximately 1:15 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

200.  The caller identification number displayed was 775-243-8735, and the caller identification name displayed was V70513155600006.

201.  Upon answering the call, Plaintiff heard an pre-recorded message that

began "Hello. This is Patricia.  I am calling from Senior Benefits.  How are you?".

The recording then stated that a licensed agent was going to come onto the line and

the transferred to lively piano music.

202.  After approximately 10 seconds of piano music, a boink sound was heard

and then a live telemarketer who identied himself as "Michael with Final Expense"

came onto the line and asked pre-qualifying questions. Amongst requested

information, Plaintiff provided a "canary trap" name of Carlos Ramirez.

203.  The call was then transferred to another telemarketer who identified

himself as Donte Grant with Family First Life.  Grant then attempted to qualify

Plaintiff for a $20,000 life insurance policy

204.  During the course of the call, Plaintiff inquired of Grant as to who the

person was that transferred the call to Grant.  Grant identified the individual as

"Dishon" who "works for [Grant's] transfer company."; Dishon transfers calls to

Grant.

<u>Call Number 14</u>

205.  On July 5, 2022, at approximately 4:10 P.M., Defendants or Defendants'

agent initiated a call to Plaintiff's residential telephone line ***-***-1212.

206.  The caller identification number displayed was 347-848-5898.

207.  Because Plaintiff was indisposed at the time, Plaintiff's wife answered

the call.  The caller asked for Carlos Ramirez and the call then disconnected.

Call Number 15

208.   On August 12, 2022, at approximately 1:16 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

209.  The caller identification number displayed was 734-228-7840.

210.  Upon answering the telephone call, Plaintiff observed a 6 second delay from the time of saying "hello" until a live telemarketer can onto the line and identified himself as "Sam" with "Senior Benefits."

211.  Sam then began to ask pre-qualification questions of Plaintiff, to which Plaintiff provided a "canary trap" name of Bruce Petri.

212.  The call was then transferred to another telemarketer who identified himself as "Luke" who then went through an application process with Plaintiff.  Upon inquiry, Luke supplied his call back telephone number as 760-580-0544.  During the call, Luke stated that he worked for YSC.  At the closing of the call, Luke stated that Plaintiff would receive his insurance policy through the U.S. Mail.

213.  Upon termination of the call, Plaintiff dialed the caller identification number displayed (734-228-7840) and received a recording that the "call did not go through."

48

<u>Call Number 16</u>

214.   On August 12, 2022, at approximately 2:35 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

215.   The caller identification number displayed was 734-228-7840.

216.   Upon answering the call, Plaintiff observed a 6 second delay from the time of saying "hello" before hearing a "boink" sound and then a live telemarketer came onto the line and identified himself as Mike Webster with Senior Benefits. Webster was promoting a final expense plan and began pre-qualifying Plaintiff. Webster asked Plaintiff his age and the amount of coverage desired.  Of significant note, Webster did not ask for Plaintiff's name at any time during this call.  Webster then stated he was transferring the call to a licensed agent, at which point the call suddenly terminated.

<u>Call Number 17</u>

217.   On August 12, 2022, at approximately 2:35 P.M., while Plaintiff was engaged in the call described as Call Number 16, *supra*, Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

218.   The caler identification number displayed was 734-228-7840.

219.   Because Plaintiff was already engaged at the time with Call Number 16, *supra*, this call was missed.

220.   The calling party did not allow the telephone to ring more than 3 times in order that Plaintiff's voice mail system could answer and take a message.

Call Number 18

221.   On August 13, 2022, at approximately 12:58 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line ***-***-9671.

222.   The caller identification number displayed was 734-330-2655.

223.   Upon answering the call, Plaintiff observed over a 6 second delay after saying "hello" before a live telemarketer identifying himself as "Kevin" calling regarding "new low cost final expense insurance plan" came onto the line.

224.   Kevin began pre-qualifying Plaintiff, and then stated that he was transferring the call to "the licensed agent" by the name of "Derrick".

225.   A live telemarketer then came on the line and identified himself as "John Murphy" and represented that he was a licensed insurance agent.  Murphy then sought personal information from Plaintiff, and Plaintiff provided a "canary trap" name of "Michael Xavier Overton". The call suddenly disconnected.

226.   Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (734-330-2655) and received a recording that "the number you have dialed is unallocated."

50

<u>Call Number 19</u>

227.   On August 13, 2022, at approximately 1:08 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

228.  The caller identification number displayed was 734-330-2391.

229.  Upon answering the call, Plaintiff observed over 10 seconds of silence after saying "hello", after which the telephone call disconnected.

230.  Immediately after the termination of the call, Plaintiff dialed the caller identification number displayed (734-330-2655) and received a recording that the number is not in service.

<u>Call Number 20</u>

231.   On August 13, 2022, at approximately 1:09 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

232.  The caller identification number displayed was 734-330-2918.

233.   Upon answering the call, Plaintiff was again speaking with "John Murphy" who claimed there was some "technical issue."  Murphy continued to qualify Plaintiff for a $15,000 life insurance policy with Omaha.

234.  The call was then transferred to "Mr. Zion" who stated that he was in the Finance Department at Omaha.  Zion sought Plaintiff's banking information and advised that a life insurance policy was being issued by Omaha.

235. Immediately after the call terminated, Plaintiff dialed the caller identification number displayed (734-330-2918) and received a recording that "the number you have dialed is no longer in service."

236. On August 15, 2022, at 10:54 A.M., Plaintiff received an email addressed to Michael X. Overton from Khonsavan Vongdara which included an United application for individual life insurance with the unique "canary trap" personal information which Plaintiff had provided during the telephone calls on August 13, 2022.

237. The application included purported signatures by Michael X. Overton that were allegedly witnessed by Khonsavan Vongdara on August 15, 2022 at 2:54 P.M. G.M.T.

## Call Number 21

238. On August 15, 2022, at approximately 11:00 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

239. The caller identification number displayed was 734-228-7840.

240. Upon answering the call, Plaintiff observed a 4-5 second delay after saying hello, a click, and then a live telemarketer identified himself as "Roy Jackson with American Benefits." Jackson asked to speak with Bruce Petri and began asking pre-qualifying questions for life insurance.

241.  The call was then transferred to a live telemarketer who identified herself as "Shannon Adams."  Adams stated that she works for Family First Life.  Adams attempted to sell Plaintiff a life insurance policy issued by Americo.

Call Number 22

242.  On August 16, 2022, at approximately 11:06 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

243.  The caller identification number displayed was 984-282-3407.

244.  Upon answering the call, Plaintiff observed a 4-5 second delay after saying "hello", a click, and then a telemarketer identified himself as Mike Webster. Webster stated that he had spoken with Plaintiff approximately three weeks previously and was following up on Plaintiff's need for life insurance.  Webster then began confirming information that he had, including referencing the "canary trap" name of "Bruce Petri" and the identical identifying particulars which Plaintiff had originally provided to another caller for the first time on August 12, 2022 during the course of Call Number 13, *supra*.

245.  Webster then transferred the call to another telemarketer who identified himself as Dario Wickham, a licensed insurance agent.  Wickham then attempted to sell a $10,000 life insurance policy to Plaintiff.

246.  Upon termination of the telephone call, Plaintiff dialed the caller

identification number displayed (984-282-3407) and received a recording that the number was invalid.

## Call Number 23

247.   On August 15, 2022, at approximately 11:00 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone ***-***-9671.

248.   The caller identification number displayed was 734-228-7840.

249.   Upon answering the call, Plaintiff observed a 3-4 second delay after saying "hello", a click, and then a live telemarketer identified himself as "Roy Jackson with American Benefits." Jackson asked to speak with Bruce Petri and began asking pre-qualifying questions for life insurance.

250.   The call was then transferred to a live telemarketer who identified herself as "Shannon Adams."  Adams stated that she works for Family First Life.  Adams attempted to sell Plaintiff a life insurance policy issued by Americo.

251.   On August 16, 2022, at 11:57 A.M., Plaintiff received an email addressed to Bruce Petri from Americo which included a copy of a $15,000 life insurance policy issued to Bruce Petri.  The policy lists the agent as being Shannon Adams.

## Call Number 24

252.   On August 24, 2022, at approximately 6:36 P.M., Defendants or Defnedants' agent initiated a call to Plaintiff's residential telephone line ***-***-

1212.

253.  The caller identification number displayed was 734-420-1763, and the caller identification name displayed was PLYMOUTH MI.

254.  Upon answering the telephone, Plaintiff observed a 5-6 second delay because a live telemarketer came onto the line and identified herself as "Emma" with "U.S. Life Benefits".

255.  Emma then began to pre-qualify Plaintiff for a "new low cost final expense life insurance policy which has just recently been approved in [Plaintiff's] state."

256.  The call was then transferred to an individual identifying himself as "Chris" the "senior guy".  Chris continued qualifying Plaintiff for a $5,000 life insurance policy and sought personal identifying information.  Plaintiff provided a "canary trap" name of Dennis Xavier Curtis.

257.  The call was then transferred to an individual identifying himself as "Zion Aydin" with United.  This is the same individual who is referenced in Paragraph 164, *supra*, as "Mr. Zion".  Zion attempted to convince Plaintiff to up the insurance policy to $10,000, and then took Plaintiff's checking account information.  The call concluded with Zion informing Plaintiff that the policy would be sent via email.

258.  Upon termination of the call, Plaintiff dialed the caller identification

number displayed (734-420-1763), which was a disconnected number.

<u>Call Number 25</u>

259.   On October 15, 2022, at approximately 12:05 P.M., Defendants or Defendants' agent initiated a telephone call to Plaintiff's cellular telephone line (***-***-9671).

260.   The caller identification number displayed was 267-900-7938.

261.   Upon answering the telephone, Plaintiff observed a 5-6 second delay because a live telemarketer came onto the line and identified herself as "Chris Ryan" with the "Final Expense Department."

262.   Ryan asked to speak with "Michael Overton" and stated that he was following up on the $15,000 life insurance policy which Plaintiff had recently purchased through Omaha.

263.   Ryan stated, as a result of Omaha having "sent a paper" inquiring about Plaintiff's medical conditions, Ryan was switching Plaintiff from life insurance with Omaha and, instead, issuing a policy with Aetna.

264.   Ryan then recited to Plaintiff the *faux* Social Security Number and address – which were part of the "canary trap" information supplied by Plaintiff during Call Number 20, *supra* – and asked for Plaintiff to confirm the information.

265.   Ryan stated that Plaintiff would be contacted back in approximately 24

hours to confirm the change in policies.

266.   Plaintiff did not hear back from Ryan, as promised.  Accordingly, on October 17, 2022, at approximately 11:32 A.M., Plaintiff dialed the telephone number appearing in the caller identification (267-900-7938) which call was answered by the same person that had identified himself in Call Number 25 as "Chris Ryan."

267.   During this call, Ryan disclosed that he did not call Plaintiff back because, when Ryan contacted Aetna, Aetna informed Ryan that Plaintiff's telephone number was listed on the National Do Not Call Registry and that Aetna did not want to issue a policy to Plaintiff for that reason.

268.   Ryan stated that he is a licensed insurance agent in 40 states.

269.   Plaintiff inquired of Ryan as to his insurance agent National Producer Number and location and Ryan refused to provide the information.

270.   Ryan hung up on Plaintiff.

271.   Based upon Plaintiff's investigation, Plaintiff reasonably believes that Ryan is not licensed as an insurance agent or solicitor or similar capacity.

<u>Call Number 26</u>

272.   On October 28, 2022, at approximately 11:01 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line ***-***-9671.

273.   The caller identification number displayed was 586-326-6350.

274.  Upon answering the call, Plaintiff observed a 5 second delay after saying "hello", then a click sound, and then an individual identified himself as "John Murphy" and asked to speak with "Michael Overton."

275.  Murphy stated that he had previously spoken "tomorrow" (*sic*) with Plaintiff regarding a final expense policy, but that the agent was not available at that time, but the agent was now available.  Murphy then attempted, several times, to transfer the call, then stated that he was unable to transfer the call to the agent due to a tornado that occurred "last night."

276.  Upon termination of the call, Plaintiff dialed the caller identification number displayed (586-326-6350) and received a recorded message that "the call cannot be completed as dialed."

Call Number 27

277.  On October 28, 2022, at approximately 11:20 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line \*\*\*-\*\*\*-9671.

278.  The caller identification number displayed was 314-763-3511.

279.  Upon answering the call, Plaintiff observed a 5 second delay after saying "hello", then a click sound, and then an individual identified himself as "Mark Anderson with the Burial Insurance Department" and asked to speak with "Michael Overton."

280.  Anderson stated he was reviewing Plaintiff's final expense application

58

and was wanted to verify Plaintiff's address, which Plaintiff confirmed.

## Call Number 28

281.   On October 28, 2022, at approximately 11:56 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line ***-***-9671.

282.  The caller identification number displayed was 314-763-3511.

283.  Upon answering the call, the same "Mark Anderson" as in Call Number 27 was on the line.

284.  Anderson stated that he was reviewing Plaintiff's application for $15,000 life insurance policy with Omaha and that the address provided by Plaintiff was coming up as a United States Post Office and that Omaha was now questioning the address.

285.  Plaintiff told Anderson that the address was correct.

286.  Plaintiff inquired of Anderson as to what company or agency he worked, and Anderson hung up.

## Call Number 29

287.   On January 9, 2023, at approximately 2:54 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's residential telephone line ***-***-0222.

288.  The caller identification number displayed was 407-760-7450 and the caller identification name displayed was "LEBRECHT NANCI".

289.  Upon answering the call, Plaintiff observed a 5-6 second delay after he said hello, then heard a "boink" sound, and then a live telemarketer came on the line and identified himself as being "Alex" with "U.S. Benefit."

290.  "Alex" then began to ask pre-qualifying questions for "a new low cost final expense plan just approved in your state."

291.  The call was then transferred to the "Senior Supervisor" by the name of "Isaac."  Isaac sought further information from Plaintiff.

292.  Plaintiff engaged Isaac by using the "canary trap" investigative technique, and provide *faux* identifying information.

293.  The call was then transferred to "Paul" who stated that he was with "Family First Life."

294.  "Paul" quoted Plaintiff a $20,000 life insurance policy with a monthly premium of $123.16 from Omaha.

295.  Plaintiff was able to obtain "Paul"'s name as being Paul Christle, that he was located in Palm Beach, Florida, and that his direct telephone number was 561-420-9620.

296.  Plaintiff confronted Christle regarding the "funny sounding" individuals that had called Plaintiff and transferred the call to Christle.  Christle explained that the individuals work "in our one our call centers" and that "what they do all day is dial, dial, dial... and then transfer the calls to me."

60

297.   On January 9, 2023, at 3:11 P.M., Plaintiff received an email from Christle with an Omaha application pre-filled with the information which Plaintiff had supplied to Christle during the telephone conversation.

298.   On January 9, 2023, at 3:22 P.M., while Plaintiff was engaged in the telephone conversation with Christle, a person or persons unknown, identifying themselves using the "canary trap" email address which Plaintiff had supplied to Christle during the telephone conversation, accessed the FTC's National Do Not Call Registry ("NDCR") database attempting to confirm the registration of Plaintiff's residential telephone number ***-***-0222 on the NDCR.

299.   Immediately after the termination of the call, Plaintiff dialed the caller identification number (407-760-7450) displayed.   The call was answered by an elderly-sounding female, who confirmed that she had not been on her telephone during the prior hour and that there was nobody at her home selling life insurance.

<u>Call Number 30</u>

300.   On January 9, 2023, at approximately 6:21 P.M., Defendants or Defendants' agents initiated a telephone call to Plaintiff residential telephone line ***-***-0222.

301.   The caller identification number displayed was 407-710-0656, and the caller identification name displayed was V109182052000300.

302.   The numeric caller identification name displayed is characteristic of an

automatic telephone dialing system being utilized.

303. Upon answering the call, Plaintiff observed a delay of approximately 10 seconds from the time of saying "hello" until a person cam onto the line and identified himself as "This is Hohn.  How are you doing today?  I am calling about a new final expense program."

304. John then asked Plaintiff some pre-qualifying questions.

305. The call was then transferred to "Isaac... the senior supervisor."  "Isaac" is the same "Isaac" described in Call Number 26, *supra*, from approximately 3 hours earlier.

306. Isaac continued to ask pre-qualifying questions.

307. Isaac then attempted to transfer the call to a live agent, the line rang and was answered by an automated system stating "[y]our call has been forwarded to an automated voice messaging system. Five Six One Four Two...." and was suddenly cut off.

308. Isaac came back onto the line and stated that the agent was busy and Paul would have to call Plaintiff back later.

309. Plaintiff asked Isaac the name of the live agent, to which Isaac responded Paul.

310. Given that the telephone number for Paul Christle in Call Number 26 also became with the same first 5 digits as were identified in the automated system, and

coincidentally was also named Paul, Plaintiff reasonably believes "Paul" to be Paul Christle.

311.  Plaintiff pressed Isaac for more information, such as the company he worked for, and his location, and his telephone number, which Isaac stated he "is not allowed to give."

312.  Upon termination of the call, Plaintiff dialed the caller identification number displayed (407-710-0656), which was a disconnected telephone number.

313.  Plaintiff has reason to believe, and does believe, that "Isaac" identified in Call Numbers 29 and 30, *supra*, is one and the same person as "Ryan Hensen" identified in Call Number 1, *supra*.

<u>Call Number 31</u>

314.  On January 31, 2023, at approximately 10:42 A.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line ***-***-9671.

315.  The caller identification number displayed was 734-316-6293.

316.  Upon answering the call by saying "hello", Plaintiff observed approximately 5 seconds of silence, then a "boink" sound, followed by an individual coming on the line and identifying himself as "Max with Senior Benefits... calling about a new low cost final expense plan."

317.  "Max" then asked pre-qualifying questions of Plaintiff.  Plaintiff responded with "canary trap" information unique to the call.

318.  "Max" then stated that the licensed agent is busy and will call back in 5 minutes.

319.  Plaintiff asked the name of the licensed agent, to which "Max" responded that her name was "Gretchen."

320.  Immediately after termination of the call, Plaintiff dialed the caller identification number displayed (734-316-6293) and received a reorder tone.

Call Number 32

321.  On January 31, 2023, at approximately 11:33 A.M., Defendants or Defendants' agents initiated a call to Plaintiff's cellular telephone line ***-***-9671.

322.  The caller identification number display was 734-559-7673.

323.  Upon answering the call, Plaintiff observed a several second delay from the time of saying "hello" until a telemarketer came on the line and identified himself as "James with U.S. Life... calling regarding a final expense plan."

324.  James stated that he had a licensed agent named "Gretchen" holding on the line and that he was going to transfer the call, but he first had some questions, and then proceeded to asked several pre-qualifying questions.

325.  The call was then transferred to a female who identified herself as Gretchen Drouhard with Family First Life.

326.  Drouhard then attempted to sell Plaintiff a $30,000 life insurance policy with a monthly premimum of $183.00 from Omaha.

327.   Drouhard when through asking Plaintiff detailed personal information and medical history questions.

328.   On January 31, 2023, at 12:21 P.M., Drouhard sent an Omaha life insurance application that was pre-filled with the personal information provided by Plaintiff during the telephone conversation to Plaintiff's controlled email address.

329.   Immediately after termination of the call, Plaintiff dialed the caller identification number displayed (734-559-7673) and received a recorded message which stated "the telephone number is not in service."

<u>Call Number 33</u>

330.   On February 1, 2023, at approximately 2:26 P.M., Defendants or Defendants' agent initiated a call to Plaintiff's cellular telephone line ***-***-9671.

331.   The caller identification number display was 734-232-9681.

332.   Upon answering the call, Plaintiff observed a 5 second delay from the time of saying "hello", then hard a "boink" sound, and then a telemarketer came on the line and identified himself as "John with Senior Benefits... calling regarding a final expense plan."

333.   John began asking pre-qualifying questions, including age, whether plaintiff had a checking or savings account, zipcode, state of residence, beneficiary, and name.

334.  Plaintiff provided "canary trap" responses to "John", including giving the

65

*faux* name of Jason Robards.

335. "John" then stated that Plaintiff was "perfectly qualified for final expense benefits" and live transferred the call to a licensed insurance agent who identified herself as Gretchen Drouhard – the same Gretchen Drouhard who attempted to sell Plaintiff a life insurance policy the day prior during Call Number 32, *supra*.

336. As Drouhard began her telemarketing pitch, the call suddenly terminated.

337. Immediately upon termination of the call, Plaintiff dialed the caller identification number displayed (734-232-9681), which turned out to be a telephone number for the Personnel Department at the University of Michigan Medical Center.

<u>Call Number 34</u>

338. On February 1, 2023, at approximately 2:30 P.M., Defendant Gretchen Drouhard initiated a call to Plaintiff's cellular telephone line ***-***-9671.

339. The caller identification number displayed was 316-833-1179.

340. Upon answering the call, Drouhard introduced herself again and explained that, for reasons unknown, the call had become disconnected.

341. Plaintiff complained to Drouhard about the loud background noise and inability to understand the caller that transferred her call to Plaintiff, to which Drouhard explained that Family First Life uses call centers outside the USA.

342. Drouhard again began her final expense life insurance sales pitch.

343. Drouhard attempted to send her business card to Plaintiff's cell phone

number, but while doing so, Drouhard recognized that she had communicated with Plaintiff the day prior at the same telephone number.

344.   Plaintiff then confronted Drouhard with the fact that Plaintiff keeps receiving the calls marketing final expense insurance and wants to know the identity of the call center involved so that Plaintiff may demand that they stop calling.

345.   Drouhard refused to name the call center, told Plaintiff "good luck," and the call terminated.

<u>Call Numbers 35 through 51</u>

346.   On the following dates and times, Plaintiff's cellular telephone ***-***-9671 received the following telephone calls all showing the caller identification number of 734-228-7840:

| Call | Date | Time | Caller Supplied Identity |
|------|------|------|--------------------------|
| 35 | 03/04/2022 | 10:16 A.M. | [Unintelligible], Medicare Benefits |
| 36 | 04/05/2022 | 1:03 PM | # |
| 37 | 04/06/2022 | 2:38 P.M. | # |
| 38 | 04/05/2022 | 5:29 P.M. | George, Medicare Benefits |
| 39 | 04/20/2022 | 3:53 P.M. | Mario, Senior Benefits |
| 40 | 04/22/2022 | 4:40 P.M. | # |
| 41 | 04/25/2022 | 1:58 P.M. | Chris, Senior Benefits |
| 42 | 05/31/2022 | 3:13 P.M. | # |
| 43 | 06/21/2022 | 1:59 P.M. | # |
| 44 | 06/21/2022 | 2:10 P.M. | # |
| 45 | 06/21/2022 | 4:32 P.M. | Charles, Senior Care Benefits |
| 46 | 06/24/2022 | 12:08 P.M. | "You stupid mother f***er...." |
| 47 | 06/24/2022 | 5:35 P.M. | Max, Health Care Solutions |
| 48 | 07/05/2022 | 5:16 P.M. | # |
| 49 | 07/06/2022 | 7:16 P.M. | Leo, Senior Care |
| 50 | 07/06/2022 | 2:47 P.M. | # |

51    07/14/2022  10:44 A.M.  #
Notes: (#) Call answered, dead air.

347.   In the case of each dead air call denoted with an octothorpe (#) in paragraph 195, *supra*, the calling party did not provide any identification or disclosure as required by 47 C.F.R. § 64.1601(a)(7)(i).

### Call Numbers 52 through 56

348.   On the following dates and times, Plaintiff's residential telephone line ***-***-1212 received the following telephone calls all showing the caller identification number of 734-228-7840:

| Call | Date | Time | Caller Supplied Identity |
|------|------|------|--------------------------|
| 52 | 07/28/2022 | 4:00 P.M. | Sam, U.S. Saving Center |
| 53 | 08/02/2022 | 4:54 P.M. | * |
| 54 | 08/05/2022 | 1:40 P.M. | * |
| 55 | 08/05/2022 | 1:41 P.M. | * |
| 56 | 08/05/2022 | 3:27 P.M. | * |

Notes: (*) Missed call.

349. In the case of each dead air call denoted with an asterisk (*) in paragraph 197, *supra*, the calling party failed to allow the phone to ring at least three times in order that Plaintiff's voice mail system might answer and take a message, as required by 47 C.F.R. § 64.1200(a)(6).

### Confrontation Calls

350.   As part of Plaintiff's investigation into the telephone calls alleged herein, Plaintiff has engaged in several instances of making "confrontation" calls to one or

more defendants and challenging said defendants regarding their involvement.

351.  On August 15, 2022, Plaintiff telephoned and spoke with Khonsavan Vongdara.  Specifically, Plaintiff confronted Vongdara regarding the telephone call identified as Call Number 17 alleged at Paragraphs 158 through 163, *supra*, and Call Number 19 alleged at Paragraphs 168 through 173, *supra*.  During the confrontation call, Vongdara represented that the persons identified as Kevin, John Murphy, and Mr. Zion were Vongdara's employees.  When Plaintiff told Vongdara that Plaintiff's telephone numbers were on the national do not call registry, Vongdara assured Plaintiff that now that Plaintiff had purchased a life insurance policy, there would be no further calls.  Plaintiff was clear and direct to Vongdara that Plaintiff did not want to receive telemarketing calls from any source.  When Plaintiff asked Vongdara for a copy of his written do not call policy, Vongdara stated that he did not have one.

352.  On August 15, 2022, approximately one hour after Plaintiff had spoken with Vongdara, Plaintiff received a call on his cellular telephone (***-***-9671) from caller identification number 304-666-3436.  The caller identified himself as Zion Aydin.  Zion stated that his broker (Vongdara) had called him regarding Plaintiff having complained to Vongdara.  Zion asked Plaintiff to "just forget about" the incident.  Zion claimed that he had 2 children and that his bosses were mad at him. Zion then told an incredible story about a woman named "Helen" (whom Zion does not know the last name of) who controls his money and pays his bills.  At one point,

Zion claimed to live in West Virginia; then changed the location to Se-ah-till-ee (phonetic), Washington; then claimed to reside at 7601 Evergreen Way, in Everett, Washington (which address, upon investigation, is a Safeway grocery store).

353.  On August 15, 2022, Plaintiff spoke with Shannon Adams over the repetitive calls he was receiving.  Adams assured Plaintiff that she would notify the call center to remove Plaintiff's telephone numbers from any further contact.

354.  On August 16, 2022, Plaintiff received a call on his cellular telephone ***-***-9671 from caller identification number 817-703-5796.  The calling party identified himself as Emmanuel, but did not provide his last name.  Emmanuel stated that Shannon Adams worked for him, and that he and his unnamed partner had notified their call center to stop calling Plaintiff. Plaintiff was able to identify "Emmanuel" as being Emmanuel Igweh, whose insurance license information reflects his telephone number as 817-703-5796.

355.  On January 31, 2023, at approximately 8:23 P.M., Plaintiff called the caller identification number displayed (314-763-3511) during Call Numbers 27 and 38, supra.  Upon the call being answered, Plaintiff asked to speak with "Mark".  The called party stated that his name was "Mark."  The called party sounded identical to the "Mark Anderson" that spoke with Plaintiff during Call Numbers 27 and 28, *supra*. Plaintiff told "Mark" that Plaintiff was calling about a life insurance policy.  "Mark" denied knowing anything about any life insurance policy.

Additional Calls

356.  Over the past twelve (12) months alone, Plaintiff has received over 400 telephone calls to his residential telephone lines \*\*\*-\*\*\*-0222, \*\*\*-\*\*\*-1000, \*\*\*-\*\*\*-1212 and/or \*\*\*-\*\*\*-2424 and/or his cellular telephone \*\*\*-\*\*\*-9671 wherein the calling party utilized a false or spoofed caller identification number, the telemarketer identified as being with "Senior Benefits" or similar generic and non-specific entity name, and wherein the telemarketer was attempting to pre-quality Plaintiff for "final expense" or life insurance.  Through the course of discovery, Plaintiff intends to establish that many of these calls are related to the same defendants in this case, at which time Plaintiff will amend his claims against the defendants to include damages related to these additional calls.

**COUNT I**
**VIOLATION OF THE TCPA - AUTODIALER CALL**

357.  Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

358.  Each of the following Calls: 12, 15 through 23, 25 through 28, 31 through 33, and 35 through 51; were in violation of the TCPA and its implementing regulations, specifically 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)(iii), as Defendant or Defendant's agent initiated a telephone call to Plaintiff's cellular telephone line using an automatic telephone dialing system without the prior express consent of the called party and there being no emergency.

359.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT II
## VIOLATION OF THE TCPA - RECORDED MESSAGECALL

360.  Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

361.  Each of the following Calls: 3 and 13; were in violation of the TCPA and its implementing regulations, specifically 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3), as Defendant or Defendant's agent initiated a telephone call to Plaintiff's residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party and there being no emergency.

362.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT III
## VIOLATION OF THE TCPA - PREMATURE HANG UP

363.  Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

364.  Each of the following Calls: 17, and 53 through 56; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(a)(6), as the call was disconnected prior to at least 15 seconds or four (4) rings.

365.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT IV
## VIOLATION OF THE TCPA - ABANDONED CALL

366. Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

364. Each of the following Calls: 1, 2, 4 through 8, 10, 12, 15, 16, 18, 19, 21 through 27, and 29 through 33; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(a)(7), as the call was not connected to a live sales representative within two (2) seconds of the called person's completed greeting.

365. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT V
## VIOLATION OF THE TCPA - DO NOT CALL

366. Plaintiff incorporates the allegations of paragraphs 1 through 356*, supra.*

367. Each of the following Calls: 1 through 6, and 8 through 56; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(c)(2), as Defendants or Defendants' agent initiated a telephone solicitation to a residential telephone subscriber who has registered his telephone number on the national do-not-call registry of persons who do not wish to receive telephone solicitations that is maintained by the Federal Government.

368. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VI
## VIOLATION OF THE TCPA - NO WRITTEN DNC POLICY

369.  Plaintiff incorporates the allegations of paragraphs 1 through 256, *supra*.

370.  Each of the following Calls: 1 through 56, inclusive; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(1), as Defendants and/or Defendants' agents failed to have a written do not call policy, available upon demand, for maintaining a do-not-call list.

371.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VII
## VIOLATION OF THE TCPA - FAILURE TO TRAIN

372.  Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra*.

373.  Each of the following Calls: 1 through 56, inclusive; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(2), as Defendants and/or Defendants' agents failed to inform and train their personnel engaged in any aspect of telemarketing in the existence and use of the do-not-call list.

374.  The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT VIII
## VIOLATION OF THE TCPA - FAILURE TO RECORD DNC REQUEST

375.  Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra*.

376. Each of the following Calls: 1 through 56, inclusive; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(3), as Defendants and/or Defendants' agents failed to record the requests made by Plaintiff not to receive calls from that person or entity.

377. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT IX
## VIOLATION OF THE TCPA - FAILURE TO IDENTIFY

378. Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

379. Each of the following Calls: 1 through 5, 7, 8, 10, 12, 13, 15, 16. 18 through 33, and 35 through 52; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(4), as Defendants and/or Defendants' agents making the calls for telemarketing purposes failed to provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and/or a telephone number or address at which the person or entity may be contacted.

380. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT X
## VIOLATION OF THE TCPA - NO DO NOT CALL LIST

381. Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

382. Each of the following Calls: 1 through 56, inclusive; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1200(d)(6), as Defendants and/or Defendants' agents making calls for telemarketing purposes failed to maintain a record of a consumer's request not to receive further telemarketing calls.

383. The aforesaid violations of the TCPA were wilful and/or knowing as is evidenced by the repeated number of calls.

## COUNT XI
## VIOLATION OF THE TCPA - FALSIFIED CALLER ID

384. Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

385. Each of the following Calls: 1 through 5, 7, 8, 10, 13, 15 through 33, and 35 through 51; were in violation of the TCPA implementing regulations, specifically 47 C.F.R. § 64.1601 (e)(1), as Defendants and/or Defendants' agents failed to provide caller identification information displaying a telephone number which would permit any individual to make a do-not-call request during regular business hours.

386. The Defendants had to take deliberate and overt action to manipulate the telephone network equipment to provide false caller identification information, therefore the aforesaid violation of the TCPA was wilful and/or knowing.

## COUNT XII
## VIOLATION OF THE MTCCCA

387. Plaintiff incorporates the allegations of paragraphs 1 through 356, supra.

388. Each of the following Calls: 1 through 5, 7, 8, 10, 12, 15 through 21, 23,

24, 26, 31 through 33, and 35 through 56; were in violation of the of the MTCCCA, specifically M.C.L. § 484.125(2)(a), as Defendants or Defendants' agent used a telephone line to contact a subscriber at the subscriber's residence to deliver a recorded message for the purpose of presenting commercial advertising and the subscriber having not requested, consented, permitted, or authorized the contact; or M.C.L. 484.125(2)(b), as Defendant or Defendant's agent delivered or attempted to deliver intrastate commercial advertising having activated a feature to block the display of caller identification information that would otherwise be available to the subscriber.

## COUNT XIII
## VIOLATION OF THE MHSSA

389.  Plaintiff incorporates the allegations of paragraphs 1 through 356, *supra.*

390.  Each of the following Calls: 1 through 56, inclusive; were in violation of the MHSSA, specifically M.C.L. § 445.111a(5), as Defendants or Defendants' agent made a telephone solicitation to a residential telephone subscriber whose name and residential telephone number is on the federal do-not-call list; and/or M.C.L. § 445.111b(1), as Defendants or Defendants' agents did not at the beginning of the telephone solicitation state his or her name and the full name of the organization on whose behalf the call was initiated and provide a telephone number of the organization on request.

## PRAYER FOR RELIEF

WHEREFORE, the aforesaid premises considered, Plaintiff prays that this Court enter a judgment for Plaintiff and against the Defendants, jointly and severally, as follows:

A.    Damages for violations of the TCPA alleged:

| Count | Violations |
|-------|------------|
| I | 34 |
| II | 2 |
| III | 5 |
| IV | 25 |
| V | 55 |
| VI | 56 |
| VII | 56 |
| VIII | 56 |
| IX | 34 |
| X | 56 |
| XI | 45 |

A total of 424 violations at $500 per violation for damages of $212,000.00, which amount shall be trebled because the violations were willful and/or knowing, for total damages of $636,000.00.

B. Damages for violations of the MTCCCA alleged at Count XII: 44 violations at $1,000 per violation for damages of $44,000.00.

C. Damages for violations of the MHSSA alleged at Count XIII: 56 violations at $250 per violation for damages of $14,000.00.

The cumulative total amount of damages claimed in this action is $694,000.00, and

in the event of default judgment is the sum certain damages amount that will be sought.

D.  An award of Plaintiff's taxable costs and disbursements incurred in the filing and prosecution of this action;

E.  An injunction enjoining Defendants from initiating any telephone calls to Plaintiff's residential telephone and cellular telephone lines.

F.  Interest accruing from the date of filing until paid at the statutory rate; and,

G.  Such other and further relief as this Court deems necessary, reasonable, prudent and proper under the circumstances.

Respectfully submitted,

Dated: February 22, 2023

_____
Mark W. Dobronski
Post Office Box 85547
Westland, Michigan 48185-0547
Telephone: (734) 330-9671
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*