# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**MARK W. DOBRONSKI**,

           Plaintiff,

v.

**FAMILY FIRST LIFE, LLC**, *et al.*

           Defendants.

Case No. **2:22-cv-12039-DPH-JJCG**

Honorable Denise Page Hood
United States District Judge

Honorable Jonathan J.C. Grey
United States Magistrate Judge

_____

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS BLAKE HUNTER SCHEIFELE AND PAUL RYAN CHRISTLE'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO RULE 12(B)(6)

Plaintiff MARK W. DOBRONSKI, appearing *in propria persona*, hereby responds in opposition to Defendants Blake Hunter Scheifele and Paul Ryan Christle's Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 143].

Plaintiff relies upon the points and authorities set forth in its appurtenant brief.

WHEREFORE, for the reasons set forth herein and in the appurtenant brief, Plaintiff respectfully urges that enter its order that Defendants Blake Hunter Scheifele and Paul Ryan Christle's Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) be **denied**.

Respectfully submitted,

Date: May 24, 2023

_____
Mark W. Dobronski
Post Office Box 85547
Westland, Michigan 48185-0547
Telephone: (734) 330-9671
markdobronski@yahoo.com
Plaintiff *In Propria Persona*

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

**MARK W. DOBRONSKI**,                     Case No.  **2:22-cv-12039-DPH-JJCG**

       Plaintiff,                     Honorable Denise Page Hood
                                United States District Judge

v.

                                Honorable Jonathan J.C. Grey

**FAMILY FIRST LIFE, LLC**, *et al.*   United States Magistrate Judge

       Defendants.

_____

# PLAINTIFF'S BRIEF IN OPPOSITION TO
## DEFENDANTS BLAKE HUNTER SCHEIFELE
### AND PAUL RYAN CHRISTLE'S
#### MOTION TO DISMISS
#### PLAINTIFF'S FIRST AMENDED COMPLAINT
#### <u>PURSUANT TO RULE 12(B)(6)</u>

## CONCISE STATEMENT OF ISSUES PRESENTED

1.    Should the First Amended Complaint ("FAC") be dismissed because Plaintiff's TCPA claims fail to allege that Defendants used an automated telephone dialing system?

> Plaintiff says:       NO.

2.    Should the First Amended Complaint be dismissed because Plaintiff has no Article III standing?

> Plaintiff says:       NO.

3.    Should the Complaint be dismissed because Plaintiff fails to state a claim with respect to Calls 1-11, 13-28, and 31-56, as he does not plead facts to support the calls related to Defendants in any way whatsoever?

> Plaintiff says: NO.

4.    Should the Complaint be dismissed for Plaintiff's failure to adequately plead vicarious liability, as Defendants did not initiate any of the Calls?

> Plaintiff says: NO.

5.    Should the Complaint be dismissed because Plaintiff invited the alleged calls?

> Plaintiff says: NO.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)

*Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 674, 577 U.S. 153, 168 (2016)

*Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019)

*Cosby v. Hoffman-La Roche, Inc.*, 2010 WL 5092779, at *2 (S.D.Ohio,2010)

*Cunningham v. Rapid Response Monitoring Services, Inc.,* 251 F.Supp.3d 1187, 1196-7 (M.D.Tenn., 2017)

*Dobronski v. Selectquote Insurance Services*, 462 F. Supp. 3d 784 790 (E.D. Mich. 2020)

*El Camino Resources, Ltd. v. Huntington Nat. Bank*, 722 F.Supp.2d 875, 901 (W.D.Mich., 2010)

*Hodgin v. UTC Fire & Sec. Ams. Corp.*, 885 F.3d 243, 252 (4th Cir. 2018)

*Lopez v. Quicken Loans, Inc.,* 461 F.Supp.3d 638, 645 (E.D.Mich., 2020)

*Louis Vuitton Malletier v. Forty*, 2005 WL 8167900, at *4 (D.Puerto Rico, 2005)

*Moore v. Auto Club Services*, 615 F.Supp.3d 670, 691 (E.D.Mich., 2022)

*Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 324 (D. Mass. 2020)

*Siding and Insulation Co. v. Combined Ins. Group, Ltd., Inc.*, 2014 WL 1577465, at *4 (N.D.Ohio,2014)

*Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547, 578 U.S. 330, 338 (U.S., 2016)

*United States v. Deckard*, 816 F.2d 426, 428 (8th Cir.1987)

*Worsham v. LifeStation, Inc.*, No. 661, Sept. 2020 Term, 2021 WL 5358876, at *16–17 (Md. Ct. Spec. App., November 17, 2021)

*Worsham v Travel Options, Inc.*, No. JKB-14-2749, 2016 WL 4592373, at *4 (D Md, September 2, 2016)

*In the Matter of Dish Network*, LLC, 28 FCC Rcd, 6574, 6593, 2013 WL 1934349 (2013)

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014 (2003)

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act*, 30 FCC Rcd. 7961, 7991, 2015 WL 4387780, at *20, ¶ 52 (FCC, July 10, 2015)

*In re State Farm Mutual Automobile Insurance Company*, 20 FCC Rcd. 13664, 13667, 2005 WL 1981564 (2005)

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 FR 44144 (July 25, 2003)

47 U.S.C. § 227

47 C.F.R. § 64.1200

47 C.F.R. § 64.1601(e)

M.C.L. § 445.111

M.C.L. § 484.125

Fed R. Civ. P. 12(b)(6)

## I.      INTRODUCTION

Plaintiff Mark W. Dobronski commenced the instant case on August 31, 2022 against Defendant Family First Life, LLC ("FFL"), 3 of its insurance companies, one independent insurance agency, and 12 of its independent insurance agents, stemming from violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, and related state consumer protection laws. A First Amended Complaint ("FAC") was filed on February 22, 2023 [ECF No. 99].

Defendants Blake Hunter Scheifele ("Secheifele") and Paul Ryan Christle ("Christle") (collectively referred to herein as "Defendants"), are two of FFL's independent insurance agents named as co-defendants in the lawsuit.

In the FAC, Plaintiff alleges to having received over 56 telephone solicitations hawking insurance products. [ECF No. 99, PageID.1023-1059, ¶¶ 102-349].

Defendants now come before the Court and argue that they cannot be held liable for the telephone solicitations received by Plaintiff and then provide a false narrative before delving into their legal arguments.  Defendants have engaged in a concert of action flooding consumers' telephones with illegal telemarketing calls. Then, when caught, Defendants play ignorant of their conduct and utilize the discredited practice of blaming the victim – in this case, Dobronski – because they have been caught.

7

A review of the First Amended Complaint will evidence the blatant and absurb falsity of Defendants' "victim blaming."

## II.    FACTS

Defendants admit that, of the 56 illegal telephone solicitations received by Plaintiff, Defendants have involvement "***in only 3 of them***." [ECF No. 143, PageID.2082](Emphasis as in original.) That admission, alone, sufficiently establishes that Defendants have, properly, been named in this lawsuit.  Defendants are participants in the overall concert of action which exists between the co-defendants, with co-defendant Family First Life LLC being at the nucleus of the overall tortious and illegal telemarketing scheme.

If two persons act in concert with a common design or purpose and one of them commits a wrongful act injuring a third party, the person acting in concert with the wrongdoer is liable for the injury under a concert of action theory. *Gaufin v. Valind*, 268 Mich. 269, 256 N.W. 335, 336 (1934). "Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words or may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each become subject to liability for the acts of the others, as well as for his own acts." *El Camino Resources, Ltd. v.*

*Huntington Nat. Bank*, 722 F.Supp.2d 875, 901 (W.D.Mich., 2010). In either case, the defendant's embrace of the actor's purpose or design—whether by agreement or by action—renders the defendant liable for the underlying tort. *Id.*

## III.   LEGAL STANDARD

In assessing a motion to dismiss under Rule 12(b)(6), this court construes the complaint in the light most favorable to the plaintiff, accepts the plaintiff's factual allegations as true, and determines whether the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (internal quotation and citation omitted); *Inge v. Rock Financial Corp.*, 281 F.3d 613, 619 (6th Cir.2002). A plaintiff's complaint must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In analyzing a 12(b)(6) motion, the court must "construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)). However, the court does not have to accept as true "unwarranted factual inferences." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 433 (6th Cir. 2008). The burden of

demonstrating that the complaint fails to adequately state a claim falls on the defendant. *Taylor*, 922 F.3d at 331.  However, ordinarily "if the requisite allegations are not in the complaint and a motion to dismiss for failure to state a claim upon which relief may be granted is made under Rule 12(b)(6), the pleader should be given the opportunity to amend the complaint, if she can, to show the existence of the missing elements." *Walker v. Shermeta, Adams, Von Allmen, PC*, 623 Fed.Appx. 764, 768 (6th Cir. 2015).

## IV.  ARGUMENT

### A.  Plaintiff has Article III standing

To satisfy Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547, 578 U.S. 330, 338 (U.S., 2016). A plaintiff establishes injury in fact, if he or she suffered " 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* at 1548.  The TCPA was passed into law in 1991 to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls." S. REP. 102–178 (codified at 47 U.S.C. § 227). It has even been said that the TCPA, which was "enacted ... to protect

10

consumers from the annoyance, irritation, and unwanted nuisance of telemarketing phone calls, grant[s] protection to consumers' identifiable concrete interests in preserving their rights to privacy and seclusion." *Bowman v. Art Van Furniture, Inc.*, No. 17-11630, 2018 WL 6444514, at *3, 2018 U.S. Dist. LEXIS 207678, at *9 (E.D. Mich. Dec. 10, 2018) (quoting *Aranda v. Caribbean Cruise Line, Inc.*, 202 F. Supp. 3d 850, 858 (N.D. Ill. 2016)). The point of the Telephone Consumer Protection Act (TCPA) is not to protect consumers from offers themselves, but the abusive mechanisms by which those offers are conveyed; thus, it is the fact of the call that creates the injury sufficient to confer standing to bring an action asserting a private cause of action for violation of the TCPA. *Cunningham v. Rapid Response Monitoring Services, Inc.,* 251 F.Supp.3d 1187, 1196-7 (M.D.Tenn., 2017). In the FAC, Plaintiff recites to his injuries giving rise to his standing to sue, including, *inter alia*: invasion of privacy and intrusion upon Plaintiff's right of seclusion [ECF No. 99, PageID.1014-1015, ¶ 63]; occupation of the telephone line by unwelcome calls [ECF No. 99, PageID.1015, ¶ 64]; nuisance and annoyance [ECF No. 99, PageID.1015, ¶ 65]; and, trespass to Plaintiff's chattel [ECF No. 99, PageID.1015, ¶ 66]. The receipt of more than one unwanted telemarketing call made in violation of the provisions enumerated in the TCPA is a concrete injury that meets the minimum requirements of Article III standing. *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259,

1270 (11ᵗʰ Cir. 2019).

### B.   Automated Telephone Dialing System

Defendants assert that Count I fails to allege that Defendants used an automatic telephone dialing system utilizing a random or sequential number generator. [ECF No. 106, PageID.1149].

In the FAC, Plaintiff recites:

> "The fact that many of telephone calls are placed using automated telephone dialing systems is indicated when calls are received with multi-second delays and/or a "boink" or clicking sound is heard before a live telemarketer comes on the line, when the call is simply dead air, and when the caller identification number display is "spoofed" or manipulated to display a false telephone number."

[ECF No. 99, PageID.1021, ¶ 92]. A review of the FAC will reveal that, with nearly each and every call detailed, Plaintiff has recited to a delay from the time of answering before the calling party came onto the line. See, *e.g.*, ECF No. 99, PageID.1023, ¶ 35. Likewise, as to nearly every call detailed in the FAC, Plaintiff has recited to the caller identification number being "spoofed." See, *e.g.*, ECF No. 99, PageID.1024, ¶ 112. This case is at the pleading stage, therefore Plaintiff only need recite enough facts to support his conclusion that an automatic telephone dialing system ("ATDS") was used; which Plaintiff has done. While a TCPA plaintiff should not be expected to plead details regarding the technical functionality of the alleged

ATDS, the complaint must include at least some facts to support the conclusion that an ATDS was used. *Izsak v. Draftkings, Inc.*, 191 F.Supp.3d 900, 904 (N.D.Ill., 2016). Different kinds of indirect allegations are adequate to allow a court to make a reasonable inference that the calls complained about were made using an ATDS. The promotional content of calls, the fact that they came from "spoofed" numbers or the timing and volume of such calls can all be sufficient to state a claim. *Rosenberg v. LoanDepot.com LLC*, 435 F.Supp.3d 308, 323 (D.Mass., 2020). Borrower's class action complaint against mortgage lender sufficiently alleged lender's use of an automatic telephone dialing system (ATDS) to place unsolicited calls... to borrower's cellular telephone, as required to state claim for violation of Telephone Consumer Protection Act's (TCPA) provision prohibiting ATDS calls; allegations included... that all calls borrower received followed the same pattern under which, after answering the call, there would be a long pause, followed by a clicking sound that would signify the dialing system was operating automatically to send the call to a live representative when one became available. *Lopez v. Quicken Loans, Inc.,* 461 F.Supp.3d 638, 645 (E.D.Mich., 2020).

> ### C.   Whether Causes of Action Relating to Calls 1-11, 13-28 and 31-56 Must Be Dismissed as to Defendants Sheifele and Christle for Failure to State a Claim

Contrary to Defendants' assertions, the calls can be attributed to Defendants

Scheifele and Christle without engaging in unfounded speculation.

As to the Defendants Scheifele and Christle, both Defendants have liability because of their participation in the overall concert of action as discussed, *supra.* Michigan law holds defendants liable for all foreseeable acts of the other tortfeasor. *Moore v. Auto Club Services*, 615 F.Supp.3d 670, 691 (E.D.Mich., 2022). Conspiracy, by reason of the connection involved among the conspirators, may cause individuals to be responsible, who, but for the conspiracy, would not be responsible at all. *Roche v. Blair*, 305 Mich. 608, 9 N.W.2d 861, 863 (1943) (quoting *Bush v. Sprague*, 51 Mich. 41, 16 N.W. 222, 225 (1883)).

We turn first to Scheifele. During Call Number 12, the telemarketer sold Plaintiff a $5,000 life insurance policy from Great Western Insurance Company ("GWIC"). [ECF No. 99, PageID.1036, ¶ 189]. GWIC mailed Plaintiff a $5,000 life insurance policy which included the "canary trap" information which Plaintiff had provided to the telemarketer. [ECF No. 99, PageID.1037, ¶ 196]. A copy of the life insurance policy is attached at EXHIBIT 1. The life insurance policy listed Defendant Scheifele as the selling insurance broker. [ECF No. 99, PageID.1037, ¶ 107]. See, also, EXHIBIT 1. Also, significantly, the same life insurance policy lists a Khonsavan Vongdara ("Vongdara") as the selling insurance agent. [ECF No. 99, PageID.1037, ¶ 198]. Coincidentally, Vongdara is another co-defendant in this

14

lawsuit, and Vongdara's name appears repeatedly throughout the FAC. [ECF No. 99, PageID.1028, ¶ 134; PageID.99, PageID.1035, ¶ 180; PageID.1043, ¶¶ 236-237; PageID.1060, ¶¶ 351-352]. Facts set forth in the FAC establish that Vongdara works for Family First Life. [ECF No. 99, PageID.1035, ¶ 179 (Olivia Perez identified herself as being with Family First Life"); ¶ 180 (Perez disclosed that her manager is Vongdara)]. Co-defendant Family First Life LLC's name appears throughout the FAC and is the nucleus of the telemarketing calls and a common denominator between all of the co-defendants.

We turn next to Christle. During Call Number 29, the call was live transferred to "Paul" who identified himself as being with "Family First Life." [ECF No. 99, PageID.1051, ¶¶ 293]. During the course of the call, Plaintiff was able to get "Paul" to disclose that his name was Paul Christle and that he was located in Palm Beach, Florida. [ECF No. 99, PageID.1051, ¶ 295]. Christle admitted that the individuals that had called Plaintiff and transferred the call to Christle work "in one of our call centers" and that "what they do all day is dial, dial, dial... and then transfer the calls to me." [ECF No. 99, PageID.1051, ¶ 296]. Thus, Christle clearly admits that the telemarketers responsible for initiating the *illegal* telephone solicitations have some sort of agency relationship with Christle. But, the scheme further unfolds. Immediately after speaking with Christle, Plaintiff received an email from Christle

sending a United of Omaha Life Insurance Application which was pre-filled with the "canary trap" information which Plaintiff had supplied to Christle during the telephone conversation. [ECF No. 99, PageID.1052, ¶ 297].  A copy of the email is attached hereto at EXHIBIT 2.

At this early stage of the case, Plaintiff only need to plausibly demonstrate a reasonable inference of liability as to each of the Defendants arising from the cause of action alleged.  A complaint need not contain "detailed factual allegations" to survive a motion to dismiss, it only requires allegations that nudge a complaint "across the line from conceivable to plausible." *Cosby v. Hoffman-La Roche, Inc.*, 2010 WL 5092779, at *2 (S.D.Ohio,2010).

> **D.   Whether Plaintiff's claims fails to sufficiently allege that any calls were initiated by Defendants.**

Defendants assert that Plaintiff has failed to establish the existence of an agency relationship between the Defendants and the party who placed the calls.  In short, Defendants are trying to hide behind the anonymity of their third-party telemarketers and pretending to be oblivious to what is going on.  However, willful blindness is not a defense. *Louis Vuitton Malletier v. Forty*, 2005 WL 8167900, at *4 (D.Puerto Rico, 2005). Willful blindness is knowledge enough. *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989).

Defendants do not have to be the person or entity that physically initiated the offensive telemarketing calls to be held liable under the TCPA. A defendant may be held vicariously liable for TCPA violations where the plaintiff establishes an agency relationship, as defined by federal common law, between the defendant and a third-party caller. *Gomez v. Campbell-Ewald Co.,* 768 F.3d 871, 879 (C.A.9 2014). Under federal common-law principles of agency, there is vicarious liability for TCPA violations. *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 674, 577 U.S. 153, 168 (2016) citing *In re Joint Petition Filed by Dish Network*, LLC, 28 FCC Rcd. 6574 (2013). The FAC expressly recites to this vicarious liability. [ECF No. 99, PageID.1013, ¶ 60].

Congress has delegated to the Federal Communications Commission ("FCC") the authority to promulgate regulations and enforce the requirements of the TCPA. See 47 U.S.C. § 227. The FCC has issued an extensive declaratory ruling on the issue of party liability under the TCPA, holding as follows:

> "[W]hile a seller does not generally initiate calls made through a third-party telemarketer, it nonetheless may be vicariously liable under federal common law agency-related principles for violations of either section 227(b) or 227(c) committed by telemarketers that initiate calls to market its products or services."

*In the Matter of Dish Network*, LLC, 28 FCC Rcd, 6574, 6593, 2013 WL 1934349, at *15, ¶ 48 (2013). The FCC provided the following reasoned explanation:

17

> "[T]he seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules. By contrast, allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief."

*Id.*, 28 FCC Rcd. at 6593, 2013 WL 1934349, at *15, ¶ 47 (2013). The FCC further opined that imposing seller liability serves to ensure that "sellers will have an incentive to carefully choose their telemarketers to ensure compliance and to force consistent violators out of the marketplace." *Id.*, 28 FCC Rcd. at 6591, 2013 WL 1934349, at *14, ¶ 44 (2013).

In another case involving an insurance company and its independent agents making telephone solicitations, the FCC reiterated that the insurance company faced vicarious liability for the telemarketing done by its independent agents, as follows:

> "[A] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our

> telemarketing rules and calls placed by a third party on
> behalf of that company are treated as if the company itself
> placed the call."

*In re State Farm Mutual Automobile Insurance Company*, 20 FCC Rcd. 13664,

13667, 2005 WL 1981564, at *3, ¶ 7 (2005).

The FCC has determined that vicarious liability in the TCPA context is

governed by the federal common law of agency. See *Hodgin v. UTC Fire & Sec. Ams.*

*Corp.*, 885 F.3d 243, 252 (4th Cir. 2018). Three agency theories may support

vicarious liability: actual authority, apparent authority, and ratification. See *Thomas*

*v. Taco Bell Corp.*, 582 F. App'x 678, 679 (9th Cir. 2014). The existence of an agency

relationship is generally a question of fact. See *Ward v. Mgmt. Analysis Co. Emp.*

*Disability Benefit Plan*, 135 F.3d 1276, 1283 (9th Cir. 1988). At the motion to

dismiss stage, a plaintiff need only "allege a factual basis that gives rise to an

inference of an agency relationship through the use of generalized as opposed to

evidentiary facts." *Mauer v. Am. Intercontinental Univ., Inc.*, No. 16 C 1473, 2016

WL 4651395, at *2, 2016 U.S. Dist. LEXIS 120451, at *2 (N.D. Ill. Sept. 7, 2016).

The FAC alleges a scheme amongst the co-defendants to engage in telephone

solicitation *en masse* to consumers to market the insurance products of the named

insurance companies. [ECF No. 99, PageID.1016-1023, ¶¶ 68-101]. Repeatedly,

Plaintiff made inquiries to the insurance agents as to "who" was the person that

initiated the call, and on each occasion the agents would explain that the call initiator was working at the insurance agent's behest. [ECF No. 99, PageID.1026, ¶ 121; PageID.1029, ¶ 143; PageID.1032, ¶ 162; PageID.1035, ¶ 180; PageID.1038, ¶ 204; PageID.1051, ¶ 296; PageID.1057, ¶ 341; PageID.1058, ¶¶ 344-5; PageID.1060, ¶ 351; PageID.1061, ¶ 353-4]. At the pleading stage, Plaintiff has plausibly alleged agency relationships between the presently-anonymous call initiators and each of the co-defendants. In the case of each and every call, when the call initiator transferred the call to one of the co-defendants, that co-defendant willingly accepted the call and then proceeded to try to sell life insurance to Plaintiff. This plausibly suggests that the call initiator had authority to do what they did – initiate the telemarketing call and transfer it to the Defendants. Each of the co-defendants ratified the call initiators' conduct by accepting the call and attempting to sell insurance to Plaintiff.

In the instance of Scheifele, Scheifele accepted the benefits that he receives from the sale of the life insurance policy to Plaintiff, thus ratifying the conduct. In the instance of Christle, Christle willingly accepted the live transfer call and engaged in the telephone solicitation to Plaintiff to sell Plaintiff a life insurance policy, once again ratifying the conduct.

## E. Counts III and IV state a valid claim

First, Defendants assert that Plaintiff does not allege that Defendants were

involved in any way in calls 17 and 53-56.  Defendants clearly want to overlook the fact that by virtue of the fact that the Defendants were involved in the overall concert of action, Defendants have joint liability with the other co-defendants.

Second, as to Count IV, Defendants are attempting to use "smoke and mirrors" to distract the Court from the requirements under the regulation.  While 47 C.F.R. 64.1200(a)(7) does impose a requirement that not more than three percent of calls be abandoned, the same sub-section goes on to set forth:

> "Whenever a live sales representative is not available to speak with the person answering the call, within two (2) seconds after the called person's completed freeting, the telemarketer or seller must provide: (A) A prerecorded identification and opt-out message... and (B) An automated, interactive voice-and/or key press-activated opt-out mechanism that enables the caller person to make a do-not-call request...."

[47 C.F.R. § 64.1200(7)(i)].  Accordingly, Defendant is correct that Plaintiff does not allege that Defendants exceeded the requisite percentage of abandoned calls during a single calling campaign – as that fact is irrelevant to the claim being brought by Plaintiff at Count IV of the FAC.

As to Defendants assertion that "Plaintiff fails to plead that any of the calls were initiated, or caused to be initiated, by Defendants", the same explanation as to Section IV.D., *supra*, is applicable here.

> **F.    Count V asserts a claim for relief under Section 227(c)(5) of**

**the TCPA**

Defendants assert that 47 C.F.R. 64.1200(c)(2) only applies to residential telephone number, but cellular telephones can never qualify as calls to "residential subscribers" under the TCPA. [ECF No. 143, PageID.2095].

47 C.F.R. 64.1200(e) promulgates:

> "The rules set forth in paragraph (c) and (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing calls to wireless telephone numbers to the extent described in the Commission's Report and Order, CG Docket No. 02-278, FCC 03-153, 'Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991.' "

[47 C.F.R. § 64.1200(e)]. Further, the FCC has declared that telephone subscribers who have listed their wireless telephone number on the national do-not-call list are deemed to be "residential subscribers". See *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, 14039, ¶ 36 (2003). Plaintiff's cellular telephone number is listed on the national do-not-call list. [ECF No. 99, PageID.1011, ¶ 51]. Plaintiff utilizes his cellular telephone primarily for personal, family, and household use. [ECF No. 99, PageID.1011, ¶ 50].

Courts have have concluded that cellular phones may qualify for protection as "residential telephone subscribers." *Barton v. Temescal Wellness, LLC*, 525 F. Supp. 3d 195, 202 (D. Mass. 2021) (noting that under the TCPA, wireless subscribers using

cellular phones can qualify as residential subscribers); *Rosenberg v. LoanDepot.com LLC*, 435 F. Supp. 3d 308, 324 (D. Mass. 2020) (same); *McDermet v. DirecTV, LLC*, No. CV 19-11322-FDS, 2021 WL 217336, at *12 (D. Mass. Jan. 21, 2021) (noting on summary judgment that the TCPA's DNC protections includes cellular phone owners).

Lastly, Defendants argue that "Plaintiff only alleges single incoming calls associated with Defendants Christle and Scheifele in Call 12 and Call 29." [ECF No. 143, PageID.2096].

Plaintiff has shown, *supra*, and in the FAC that Defendants Scheifele and Christle are each for Family First Life.  The majority of the calls alleged in the FAC are with agents claiming to be with the same entity – to wit, Family First Life.

The FAC details 52 calls that were initiated between July 31, 2021 and July 31, 2022.  Clearly, Plaintiff received "more than one call within any 12-month period by or on behalf of the same entity."

### G.    Counts VI - X

Count VI recites to violations under 47 C.F.R. § 64.1200(d)(1), which requires that "[p]ersons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list."  A private right of action exists for a violation of 47 C.F.R. § 64.1200(d)(1). *Dobronski v.*

*Selectquote Insurance Services*, 462 F.Supp.3d 784, 791 (E.D.Mich., 2020).

Count VII recites to violations under 47 C.F.R. § 64.1200(d)(2), which requies that "[p]ersonnel engaged in any aspect of telemarketing must be informed and trained in the existence of the do-not-call list."

Count VIII recites to violations under 47 C.F.R. § 64.1200(d)(3), which provides for the recording and disclosure of do-not-call requests.

Count IX recites to violations under 47 C.F.R. § 64.1200(d)(4), which requires that "[a] person of entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted." Section 64.1200(d)(4) violations are actionable through Section 227(c)'s private right of action. *Robison v. 7PN, LLC*, 569 F.Supp.3d 1175, 1184 (D.Utah, 2021).

47 U.S.C. § 227(c)(5) promulgates"

> "A person who has received more than one telephone call within any 12-month period *by or on behalf of the same entity* in violation of the regulations prescribed under this subsection may... bring in an appropriate court of that State – ... (B) an action to recover monetary loss from such a violation, or to receive up to $500 in damages *for each such violation*, whichever is greater...."

[Emphasis added.]

Defendants assert that "there is nothing in Plantiff's complaint that indicates whether or not Defendants maintained a do not call policy or trained personnel." [ECF No. 143, PageID.2098]. That assertion is false. The FAC sets forth that when Plaintiff did make a demand for a copy of a do-not-call policy, Plaintiff was informed that they did not have one. [ECF No. 99, PageID.1060, ¶ 351]. Coincidenally, that inquiry was made to co-defendant Vongdara. During Call Number 12, the GWIC life insurance policy hawked to Plaintiff listed Scheifele as the selling broker [ECF No. 99, PageID.1037, ¶ 197] and Vongdara as the selling agent. [ECF No. 99, PageID.1037, ¶ 198]. Thus, it is reasonable to infer that Scheifele is Vongdara's boss. And, given that Vongdara admitted that the they do not have a written do not call policy, it is reasonable to infer that Scheifele also does not have one and that Scheifele did not train his personnel on the use of same.

Defendants also argue that "Plaintiff does not allege that the callers failed to identify themselves or the companies they were associated with." Once again, Defendants misrepresent what the FAC pleads.

Repeatedly throughout the FAC are a myriad of examples of telephone solicitations where the caller misrepresented the identity of the entity. [ECF No. 99, PageID.1023, ¶ 104 ("John with American Senior Benefits"); PageID.1025, ¶ 118 (refused to identify company calling on behalf of); PageID.1026, ¶ 125 ("Brad from U.S. Benefits"); PageID.1027, ¶ 130 ("John with Life Benefits"); PageID.1029, ¶ 139

("Benjamin with Senior Benefits"); PageID.1030, ¶ 151 (refused to identify company); PageID.1031, ¶ 156 ("Zack with Senior Benefits"); PageID.1034, ¶ 172 ("James with Final Expense"); PageID.1035, ¶ 184 (provided no entity name); PageID.1036, ¶ 186 ("Elijah Wood in the Final Expense Department"); PageID.1038, ¶ 201 (Patricia from Senior Benefits); PageID.1039, ¶ 210 (Sam with Senior Benefits); PageID.1040, ¶ 216 (Mike Webster with Senior Benefits); PageID.1041, ¶ 223 (did not identify company calling on behalf of); PageID.1043, ¶ 240 (Roy Jackson with American Benefits); PageID.1044, ¶ 244 (did not identify company calling on behalf of); PageID.1045, ¶ 249 (Roy Jackson with American Benefits); PageID.1046, ¶ 254 (Emma with U.S. Life Benefits); PageID.1047, ¶ 261 (Chris Ruan with the Final Expense Department); PageID.1049, ¶ 274 (did not identify company calling on behalf of); PageID.1049, ¶ 279 (Mark Anderson with the Burial Insurance Department); PageID.1051, ¶ 289 (Alex with U.S. Benefit); PageID.1053, ¶ 305 (did not identify company calling on behalf of); PageID.1054, ¶ 316 (Max with Senior Benefits); PageID.1055, ¶ 323 (James with U.S. Life); PageID.1056, ¶ 332 (John from Senior Benefits)].

Not only did the callers make deliberate attempts to remain clandestine by providing false identies, the FAC also details how the callers repeatedly attempted to conceal their identities by repeatedly falsifying their caller identification number information. [ECF No. 99, PageID.1067, ¶ 385].

At the same time that the co-defendants are engaged in wholesale TCPA violations, misrepresenting and concealing their identities and spoofing their caller identification information, Defendants have the unmitigated intestinal fortitude to criticize Plaintiff because Plaintiff had to engage in in various identigative techniqueues to identify the sources of the telemarketing calls being received. [ECF No. 99, PageID.1022-1023, ¶¶ 99-100]. The conduct of the Defendants and co-defendants was *illegal*.  Plaintiff's conduct was not.  Defendants are upset because they were caught by Plaintiff.

Both Scheifele and Christle share joint liability with all of the co-defendants for their tortious concert of action.

### H.    Count XI - There is a private right of action under 47 U.S.C. 227(c)(5) for a violation of 47 C.F.R. 64.1601(e)(1)

Defendants argue that there is no cause of action for violation of the caller identification regulation set forth at 47 C.F.R. § 64.1601(e).  In support of their argument, Defendants recite to three cases in the United States District Court for the Eastern District of Michigan wherein this same Plaintiff has been previously unsuccessful in arguing that there is a private right of action for violations of 47 C.F.R. § 64.1601(e). All three decisions (*Dobronski v. Total Insurance Brokers,* LLC, No. 21-10035, 2021 WL 4338957, at *7 (E.D. Mich. May 14, 4021); *Dobronski v. SunPath Ltd*., No. 19-13094, 2020 WL 8840311, at *7 (E.D. Mich July 20, 2020);

27

and, *Dobronski v. Selectquote Insurance Services*, 462 F. Supp. 3d 784 790 (E.D. Mich. 2020)) expressly relied upon the finding in an unpublished case -- *Worsham v. Travel Options, Inc.*, No. JKB-14-2749 2016 WL 4592372, at *7 (D. Md. September 2, 2016) – as being "persuasive". The fact remains that none of the above-recited decisions are binding precedent upon any court, and certainly not this Court.

47 C.F.R. § 64.1601(e) was adopted by the FCC in 2003. See *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 FR 44144 (July 25, 2003) ("Final Rule"). The FCC expressly recites in the Final Rule that it has adopted the regulations set forth therein, including the newly promulgated § 64.1601(e), pursuant to the authority of 47 U.S.C. § 227 and the Do-Not-Call Implementation Act, Public Law 108-10, 117 Stat. 557. The entirety of the Final Rule addresses the regulatory requirements promulgated by Congress under the various sub-subsections of 47 U.S.C. § 227(c). The TCPA requires the FCC "to protect residential telephone subscribers' privacy rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). In so doing, 47 U.S.C. § 227(c)(1)(a) directs the Commission to "compare and evaluate alternative methods and procedures" including the use of electronic databases and other alternatives in protecting such privacy rights. *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 FR 44144-01 (FCC July 25, 2003).

In its summary of the Final Rule, the FCC states:

"In this document, we revise the current Telephone Consumer Protection Act of 1991 (TCPA) rules, and adopt new rules to **provide consumers with several options for avoiding unwanted telephone solicitations**. These new rules establish a national do-not-call registry, set a maximum rate on the number of abandoned calls, **require telemarketers to transmit caller ID information**, and modify the Commission's unsolicited facsimile advertising requirements." [Emphasis added.]

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 68 FR 44144 (July 25, 2003). Clearly, the requirement for caller identification is an alternative method or procedure in protecting such privacy rights. This leads to the reasonable conclusion that the FCC was acting within its delegated authority under 47 U.S.C. § 227(c) when it promulgated § 64.1601(e).

In *Worsham v. Travel Options, Inc.*, the judge was clearly having some difficulty in determining under which subsection of 47 U.S.C. § 227 the subject regulation – 47 C.F.R. § 64.1601(e) – was adopted and explained his quandry, as follows:

"In recognition of the role played by Caller ID in helping consumers avoid unwanted calls, and in conjunction with other amendments to its TCPA regulations in § 64.1200 et seq., the FCC specifically amended this set of regulations in 2003 by adding § 64.1601(e), which requires telemarketers to transmit caller identification information, including either calling party number ("CPN") or automatic number identification of the calling party's billing number ("ANI") and, when available by the telemarketer's carrier, the telemarketer's name; this regulation also prohibited

telemarketers from blocking the transmission of caller identification information. Rules and Regulations Implementing...(TCPA), 68 Fed. Reg. at 44,179. **However, it is not clear whether § 64.1601(e) is promulgated under either subsection b or subsection c of the TCPA**. Caller ID technology does not fit neatly into the focus of either subsection, neither of which requires the use of such technology to accomplish their respective purposes. **Thus, it is also not clear whether a violation of § 64.1601(e) falls within the private right of action granted by subsection b or subsection c.** It seems just as likely that **the FCC may have only intended** to ensure consistency between its preexisting Caller ID regulations and its revised TCPA regulations and/or the FTC's regulations pertaining to telemarketing when the FCC promulgated § 64.1601(e); those efforts all occurred at the same time, in 2003. Additionally, the FCC said, 'Caller ID requirements will improve the ability of consumers to identify and enforce do-not-call rights against telemarketers.' 68 Fed. Reg. at 44,156. **Therefore, the FCC's rule in § 64.1601(e) appears to support consumers' enforcement efforts under the TCPA's subsection c, rather than to create a separate mechanism upon which a consumer can make an actionable claim.**" [Emphasis added.]

*Worsham v Travel Options, Inc.*, No. JKB-14-2749, 2016 WL 4592373, at *4 (D Md, September 2, 2016). However, the *Travel Options* judge apparently failed to read beyond the subsection title of 47 U.S.C. § 227(d), as nowhere in subsection *d* is there <u>any</u> mention of caller identification. Subsection *d* expressly – and solely -- addresses technical and procedural standards for telephone facsimile machines and artificial or prerecorded voice systems.

Recently, a three judge panel on a state appellate court considered this same

issue and unanimously determined that a private right of action does exist for

violations of 47 C.F.R. § 64.1601(e).  In *Worsham v. Life Station, Inc.*, the Court of

Special Appeals of Maryland opined and very cogently and concisely explained:

> "[T]he first amended complaint alleges a violation of 47 C.F.R. § 64.1601(e)(1), an FCC regulation requiring that '[a]ny person or entity that engages in telemarketing, as defined in 47 C.F.R. § 64.1200(f)(10), must transmit' certain information via Caller ID. The circuit court ruled that Mr. Worsham could not bring a private cause of action for violation of this regulation, relying again on the **unreported decision** in *Travel Options,* which **rather hesitantly determined** that the regulation was promulgated under the authority of § 227(d), rather than § 227(c), of the TCPA. *Travel Options*, 2016 WL 4592373, at \*7; see also *Dobronski v. Selectquote Ins. Servs.*, 462 F. Supp. 3d 784, 789-90 (E.D. Mich. 2020).
>
> Section 64.1601(e)(1) prohibits telemarketers from appearing on telephone subscribers' Caller IDs as 'unknown' by requiring them to transmit certain Caller ID information, including the Calling Party Number ("CPN") or Automatic Numbering Information ("ANI"), and, if possible, the name of the telemarketer.
>
> The regulation further provides that the information provided must be sufficient to 'permit any individual to make a do-not-call request during regular business hours.' 47 C.F.R. § 64.1601(e)(1). Thus, at an initial glance, § 64.1601(e)(1) contains aspects that seem to further the purposes of both § 227(c) and (d). We must therefore explore each further.
>
> Section 227(c) authorizes the FCC to promulgate rules to protect telephone consumers' privacy rights and create rules that will allow consumers to 'avoid receiving

telephone solicitations to which they object.' The FCC is directed to do so by 'compar[ing] and evaluat[ing] alternative methods and procedures (including ... telephone network technologies ...) for their effectiveness in protecting such privacy rights.' 47 U.S.C. § 227(c)(1)(A). Section 227(d), on the other hand, instructs the FCC to (1) revise its rules for telephone facsimile machines, requiring the use of machines that can mark the faxed pages with identifying information, (2) prescribe rules requiring automatic or prerecorded telemarketing messages to include the identity of the telemarketer at the beginning of the message and its telephone number or address during, or at the end, of the message, and (3) automatically release the called party's line within five seconds. Importantly, as discussed above, § 227(d) does not purport to regulate live telemarketing calls.

In adopting § 64.1601(e)(1), the FCC reasoned that 'Caller ID allows consumers to screen out unwanted calls and to identify companies that they wish to ask not to call again. Knowing the identity of the caller is also helpful to consumers who feel frightened or threatened by hang-up and dead air calls.' 68 Fed. Reg. at 44,167. Additionally, Caller ID allows a consumer to 'make a do-not-call request during regular business hours,' § 64.1601(e)(1), further protecting the subscriber's privacy right by preventing future calls. Although the FCC's consideration of what network information must be transmitted via Caller ID is technical, we think it falls within the scope of the technologies that § 227(c)(1)(A) directed the FCC to consider in protecting the privacy rights of consumers. See 68 Fed. Reg. at 44,166-67 (evaluating the cost efficiency and availability of different network technologies for network transmission).

Although the question is not free from doubt and the lines between regulations authorized by § 227(c) and (d) (or, perhaps, some combination of both) could be far clearer,

for two reasons, we conclude that **§ 64.1601(e)(1) was promulgated pursuant to § 227(c)** and, therefore, that **a private right of action exists to enforce its provisions**. First, to the extent the express terms of § 64.1601(e)(1) apply to live telemarketing calls, they would **exceed the scope of regulation authorized by § 227(d)**, but not the scope of § 227(c). Second, by requiring the provision of information expressly for the purpose of allowing individuals 'to make a do-not-call request,' the regulation serves the purpose of § 227(c) of 'protect[ing] subscribers from unrestricted commercial telemarketing calls.' 68 Fed. Reg. at 44,167." [Emphasis added.]

*Worsham v. LifeStation, Inc.*, No. 661, Sept. 2020 Term, 2021 WL 5358876, at

*16–17 (Md. Ct. Spec. App., November 17, 2021).

Accordingly, consistent with the reasoning set forth in *Worsham v. LifeStation, Inc.*, Plaintiff asserts that a private right of action does exist under 47 C.F.R. § 64.1601(e), and this Court should so hold.

## I.   Willfulness

The Complaint in the instant case at bar expressly alleges that Defendants "ares well aware of the illegal tactics being used by their contracted call centers, but are deliberately indifferent to what is occurring so as to be able to engage in willful blindness and represent that they are 'unaware' of the illegal telemarketing conduct." [ECF No. 99, PageID.1022, ¶ 97].  As stated, *supra*, Defendants are equally liable with the other co-defendants.  See *Rosenberg*, *supra*.  As set forth, *supra*, the FCC has determined that "[t]he seller is in the best position to monitor and police TCPA

compliance by third-party telemarketers." *Dish Network*, 28 FCC Rcd. at 6593, 2013 WL 1934349, at *15, ¶ 47 (2013).

As discussed, *supra*, there is joint liability in a civil conspiracy or concert of action tort.  Defendants share in the liability with the other co-defendant tortfeasors. Plaintiff's telephone numbers were listed on the National Do Not Call Registry. [ECF No. 99, PageID.1011-1012, ¶¶ 51-52].  By listing his numbers on the National Do Not Call Registry, Plaintiff has given notice to the World that he does not wish to receive telephone solicitations at his residential or cellular telephone numbers. [ECF No. 99, PageID.1012, ¶ 53].  Defendant even went further and made specific "do not call" demands during calls.  [ECF No. 99, PageID.1035, ¶ 180; PageID.1058, ¶ 344].

The fact that the caller identification numbers in almost, if not all, of the telephone calls had been manipulated to display false numbers took a deliberate and overt act to manipulate the telephone network, and evidences a "willful and knowing" violation of the TCPA.  [ECF No.99, PageID.1067, ¶ 386]. See 47 C.F.R. § 64.1601(e).  And, this regardless of whether there is a private right of action for a violation of that regulation.  The "willful" nature of the other claims is evidenced by the repetitiveness and cannot be glossed over as an innocent mistake.  Willful means "conscious and deliberate commission or omission ... irrespective of any intent to violate [ ]." 47 U.S.C. § 312(f). *Siding and Insulation Co. v. Combined Ins. Group,*

*Ltd., Inc.*, 2014 WL 1577465, at *4 (N.D.Ohio,2014). The FCC has imposed monetary forfeitures against licensees when their actions were "indisputably willful and patently inconsistent with the plain language" of the applicable regulations, even if they "may not have set out with the specific intention of violating" an FCC rule. *U.S. v. Baxter*, 841 F.Supp.2d 378, 393 (D.Me., 2012).

Plaintiff's rely upon another case in this district involving Plaintiff – *Dobronski v Total Insurance Brokers, LLC*, No. 21-cv-109035, 2021 WL 4452218, at *4 (E.D. Mich. Sept. 29, 2021) ("*Total*") – to suggest that "Plaintiff gave implied consent for any alleged calls made." [ECF No. 106, PageID.1162.  In *Total*, that court held that Plaintiff gave "implied consent" to the second call. However, that court did not consider that the TCPA and the Commission's rules plainly require *express* consent, not *implied* or "*presumed*" consent. *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act*, 30 FCC Rcd. 7961, 7991, 2015 WL 4387780, at *20, ¶ 52 (FCC, July 10, 2015).  The Supreme Court has long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 104 S.Ct. 2778, 2782, 467 U.S. 837, 844 (1984).

Once again, Defendants make misrepresentations as to what has been pled in

the FAC when they assert that "Plaintiff does not allege that he requested not to be called until his outgoing 'confrontation calls.'" [ECF No. 143, PageID.2100]. Defendants' assertion is belied by a review of the FAC.

First, and foremost, Plaintiff's telephone numbers are all listed on the National Do Not Call Registry. [ECF No. 99, PageID.1011-1012, ¶ 51-52].

Second, Plaintiff made repeated "do not call" demands. [ECF No. 99, PageID.1026, ¶ 121 (Plaintiff confronted Vanina regarding the source of the calls); PageID.1032, ¶ 162 (Plaintiff confronted Perez regarding the telemarketer); PageID.1035, ¶ 180 (Plaintiff confronted Perez regarding the numerous calls being received; Perez stated that she would make sure to place Plaintiff's telephone number on their do-not-call list); PageID.1048, ¶ 267 (Ryan disclosed that he knew that Plaintiff's telephone number was listed on the National Do Not Call Registry); PageID.1051, ¶ 296 (Plaintiff confronted Christle regarding the individuals that had called Plaintiff and transferred the call to Christle); PageID.1058, ¶ 344 (Plaintiff confronted Drouhard regarding the call and wanted to know the identity of the call center involved so that Plaintiff may demand that they stop call; Drouhard hung up on Plaintiff).

Third, after nearly each and every call, Plaintiff would dial the caller identification number displayed during the incoming call, but found the numbers to

36

have been spoofed. [ECF No. 99, PageID.1024, ¶ 112; PageID.1026, ¶ 122; PageID.1026-1027, ¶ 127; PageID.1027-1028, ¶ 133; PageID.1029, ¶ 144; PageID.1032, ¶ 163; PageID.1033, ¶ 168; PageID.1034, ¶ 176; PageID.1035, ¶ 181; PageID.1036, ¶ 193; PageID.1036, ¶ 194; PageID.1039, ¶ 213; PageID.1041, ¶ 226; PageID.1042, ¶ 230; PageID.1043, ¶ 235; PageID.1044-1045, ¶ 246; PageID.1046-1047, ¶ 258]; PageID.1049, ¶ 276; PageID.1052, ¶ 299; PageID.1054, ¶ 313; PageID.1055, ¶ 320; PageID.1056, ¶ 329; PageID.1057, ¶ 337]. The TCPA regulations, at 47 C.F.R. § 64.1601(e) expressly requires that "[a]ny person or entity that engages in telemarketing... must transmit caller identification information." Further, 47 C.F.R. § 64.1601(e)(1) clarifies that "[t]he telephone number so provided must permit any individual to make a do-not-call request during regular business hours." By the callers spoofing their caller identification number on each call, the callers deliberately prevented Plaintiff from being able to make "do not call" demands to them. The Defendants had to take deliberate and overt action to manipulate the telephone network equipment to provide false caller identification information, therefore the violations of the TCPA were willful and/or knowing. [ECF No. 99, PageID.1067, ¶ 386].

The only effort that Plaintiff need undertake to avoid unwanted telephone solicitation calls is to post his telephone numbers on the National Do Not Call

Registry.  This the Plaintiff has done.  Telemarketers are required, not less often than every 31 days, to obtain a copy of the National Do Not Call Registry and to "scrub" their telephone lists against it.  47 C.F.R. § 64.1200(c)(2)(i)(D). Obviously, had Defendants done so, they would have known that Plaintiff did not wish to receive telephone solicitations.  There is no requirement that Plaintiff must reach out to every caller and make a do-not-call demand.  Nonetheless, the FAC documents that even where Plaintiff did make do-not-call demands to callers, the calls continued.

## J.    Count XII - MTCCCA Claim

Here, Defendants urge that the "MTCCCA claim must be dismissed to the extent that Plaintiff fails to allege Defendants used any prerecorded messages or block features." [ECF No. 106, PageID.1163]. The FAC details that prerecorded telemarketing messages were received in Call 3 and Call 13 [ECF No. 99, PageID.1026, ¶ 125; PageID.1037-8, ¶ 201].  Further, almost each and every one of the initiated telephone calls had "spoofed" telephone numbers. [See, *e.g.*, ECF No. 99, PageID.1024, ¶ 112].  By engaging in the covert act of manipulating the caller identification number information, the caller has "activate[d] a feature to block the display of caller identification information that would otherwise be available to the subscriber." See M.C.L. § 484.125(2)(b).

As far as whether the Defendants called Plaintiff directly or utilized third-party

telemarketers to initiate the calls, the Defendants have vicarious liability as part of the concert of action, as explained, *supra*. Scheifele ratified the conduct by accepting the life insurance policy as the selling insurance broker. [ECF No. 99, PageID.1037, ¶ 197]. Christle accepted the live call transfer [ECF No. 99, PageID.1051, ¶ 293], engaged in selling a life insurance policy to Plaintiff [ECF No. 99, PageID.1051, ¶ 294], and acknowledged the involvement of his third-party telemarketers [ECF No. 99, PageID.1051, ¶ 296].

Lastly, Defendants argue that the none of the "calls linked to Defendants originated in Michigan." [ECF No. 106, PageID.1163]. The FAC shows that almost all of the initiated telephone solicitations displayed caller identification numbers with a <u>Michigan</u> area code[1][2], were received by Plaintiff's cellular telephone which has a

---

[1]       ECF No. 99, PageID.1023, ¶ 103 (734-419-5984); PageID.1025, ¶ 115 (734-434-2391); PageID.1025, ¶ 124 (734-899-2113); PageID.1027, ¶ 129 (734-420-1658); PageID.1029, ¶ 138 (734-420-1559); PageID.1030, ¶ 150 (734-911-9748); PageID.1031, ¶ 156 (734-499-0082); PageID.1033, ¶ 171 (734-420-1419); PageID.1035, ¶ 183 (734-330-2168); PageID.1039, ¶ 209 (734-228-7840); PageID.1040, ¶ 215 (734-228-7840); PageID.1040, ¶ 218 (734-228-7840); PageID.1041, ¶ 222 (734-330-2655); PageID.1042, ¶ 228 (734-330-2391); PageID.1042, ¶ 232 (734-330-2918); PageID.1043, ¶ 239 (734-228-7840); PageID.1045, ¶ 248 (734-228-7840); PageID.1046, ¶ 253 (734-420-1763); PageID.1048, ¶ 273 (586-326-6350); PageID.1054, ¶ 315 (734-316-6293); PageID.1055, ¶ 322 (734-559-7673) PageID.1056, ¶ 331 (734-232-9681); PageID.1058, ¶ 346, Calls 35-51 (734-228-7840); PageID.1059, ¶ 348, Calls 52-56 (734-228-7840).

[2]       The Court can take judicial notice of the fact that North American Numbering Plan area codes 734 and 586 are assigned to Michigan.

Michigan area code[3], and Plaintiff was in Michigan when the calls were received[4]; thus, the calls, plausibly, were *intrastate* telephone solicitations. This is sufficient at the pleading stage to establish that the calls originated in Michigan. Courts routinely take judicial notice of the geographic regions associated with telephone area codes. See, *e.g.*, *Fishman v. Subway Franchisee Advertising Fund Trust, Ltd.*, 2019 WL 6135030, at *2 (C.D.Cal., 2019)(taking judicial notice that the area code 310 is within the West Los Angeles area); *Eliman v. Law Office of Weltman*, No. 12-cv-01599-DMG, 2013 WL 12119720, at *4 (C.D. Cal. Jan. 2, 2013)(taking judicial notice that the area code 310 includes the West Los Angeles area); *Garner v. Allstate Insurance Company*, 2021 WL 3857786, at *1, n. 2 (N.D.Ill., 2021)(taking judicial notice of the geographic regions associated with the area codes alleged in Plaintiffs' class action complaint as matters of public record); *Cooley v. Freedom Forever LLC*, 2020 WL 8840308, at *2, n. 1 (D.Nev., 2020)("This court takes judicial notice of the geographic regions attributable to all telephone area codes."); *Global Mfg. Group, LLC v. Gadget Universe.Com*, 417 F.Supp.2d 1161, 1174, n. 4 (S.D.Cal., 2006)(taking judicial notice of fact that disclosed telephone area code served particular geographic area); *United States v. Deckard*, 816 F.2d 426, 428 (8th

---

[3]      ECF No. 99, PageID.1070 (734-330-9671).

[4]      ECF No. 99, PageID.1000, ¶ 25.

Cir.1987)(taking judicial notice of the 314 area code).

### K.    Count XIII - MHSSA Claim

Agents argue that Plaintiff has not plausibly alleged that any of the Defendants were involved in, or were otherwise responsible for, the telephone solicitations to Plaintiff. [ECF No. 106, PageID.1163].    The fact is that the FAC shows the involvement of each of the named Defendants in various of the telephone calls.  By way of example, Schiefele was the selling insurance broker named on the life information policy which was hawked to Plaintiff during Call 12. [ECF No. 99, PageID1037, ¶ 197].  Christle directly spoke with Plaintiff during Call 29. [ECF No. 1051, ¶ 295].

Defendants argue that "Christle provided his name and the organizations or agencies he was with." [ECF No. 143, PageID.2103].  However, the statute requires that the information must be provided "*[a]t the beginning* of a telephone solicitation..." M.C.L. § 484.111b(1) [Emphasis added.] The FAC discloses that, at the beginning of Call 29, the telemarketer identified himself as "Alex... with U.S. Benefits." [ECF No. 99, PageID.1051].  Since "U.S. Benefits" is a non-existent entity, Alex failed to state "the full name of the organization or other person on whose behalf the call was initiated."

Lastly, Defendants argue that "Plaintiff alleges that he provided fake aliases to

invite further calls and began the process of signing up for insurance, establishing that he provided express invitation, permission, or was an existing customer." [ECF No. 143, PageID.2103]. Defendants, conveniently, misrepresents the exception set forth in the statute. M.C.L. § 445.111(m)(i) promulgates that "telephone solicitation" does not include "[a] voice communication to a residential telephone subscriber with that subscriber's express invitation or permission *prior to the voice communication*." (Emphasis added.)  At the time that the telephone solicitation was initiated, the telemarketer did not know Plaintiff's identity and had to request it evidences that there no prior express invitation or permission given. [ECF No. 99, PageID.1051, ¶ 292].  This fact also belies any belief by the Defendants that  Plaintiff was an "existing customer" at the time the call was initiated, as the callers would not then be attempting to sell a life insurance policy to Plaintiff, let alone having to ask for his name and other identifying information.

## CONCLUSION

WHEREFORE, Plaintiff Mark W. Dobronski respectfully requests that this Court enter its order that Defendants Blake Hunter Scheifele and Paul Ryan Christle's Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) [ECF No. 143] be **denied**.

Respectfully submitted,

Date: May 24, 2023

_____

Mark W. Dobronski
Post Office Box 85547
Westland, Michigan 48185-0547
Telephone: (734) 330-9671
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*

## CERTIFICATE OF SERVICE

I, Mark W. Dobronski, certify that on **May 24, 2023**, I caused a copy of the foregoing *Plaintiff's Response in Opposition to Defendants Blake Hunter Scheifele and Paul Ryan Christle's Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)* to be served upon all parties of record by sending same in a sealed envelope, with first-class postage fully prepaid thereupon, and deposited in the United States Mail, addressed as follows:

John T. Mihelick, Esq.
Dinsmore & Shohl, LLP
900 Wilshire Drive, Suite 300
Troy, Michigan 48084-1600

Matthew J. Lund, Esq.
Troutman Pepper Hamilton Sanders LLP
4000 Town Center, Suite 1800
Southfield, Michigan 48075-1505

Alvin Lee, Esq.
King & Spalding LLP
1185 Avenue of the Americas, 34th Floor
New York, New York 10036-2603

Jennifer W. Weller, Esq.
Hinshaw & Culbertson, LLP
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606-1915

D. Peter Valiotis, Esq.
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226-3435

Lewis Jan Friedman
921 Ormsby Street
Vista, California 92084-1436

_____
Mark W. Dobronski

44

# EXHIBIT 1



**GREAT WESTERN**
**INSURANCE COMPANY**
P.O. Box 14410, Des Moines, IA 50306-3410

Policy/Certificate Number: 00GWF0079850                    June 24, 2022
Coverage type: Limited Ben Final Expense

Dear Mark W Dobronski,

Welcome to Great Western Insurance Company! Thank you for choosing us for your insurance needs.

Included in this packet you will find your new policy. Please take a few minutes to review and complete the following:

- Review the policy and application for accuracy.
- Check the effective date shown on the policy schedule page.
- Notify us as soon as possible if any information has changed or is incorrect.
- If you are replacing existing coverage with this policy, you will need to notify the previous insurance company to terminate existing coverage.
- Premiums will be paid monthly by automatic credit card payment and your card will be charged on the 3rd of the month when the premium is due.
- File this policy with your important documents and inform a family member or the person responsible for your final arrangements of this policy and where it is located.

If you have any questions about your coverage, you can visit our customer portal on our website, www.gwic.com, and click on "Member Login" on the top right side of the page. After you register for an online account, you will be able to access policy information, download forms, check claim status, and enroll in automatic payments through your bank account. You may also call our Customer Care Center at 800-733-5454, Monday through Friday, from 7:30 a.m. to 5 p.m. Central time.

Thank you again for entrusting us with your insurance needs. We appreciate your business.

Sincerely,

*Thomas A. Swank*

Thomas A. Swank, President

LM2730 (09-17)

R581460-2/3-00057





Dear Policyholder:

Great Western is the provider of your insurance policy. We appreciate your business and value our relationship with you.

As part of that relationship, be assured that we respect your personal privacy. We don't sell information. Furthermore, we don't share any information regarding our customers with anyone outside of Great Western, other than policy beneficiaries, assignees or agents.

Federal law requires banks, investment and insurance companies to notify their customers annually, of their official Privacy Policy. We encourage you to read our formal Privacy Policy printed below.

It is our pleasure to serve you and we sincerely appreciate your business.

Sincerely,

*Thomas A. Swank*

Thomas A. Swank, President

# Privacy Policy
*Great Western's Customer Commitment Includes*
*Respect for Your Personal Privacy*

Great Western has a long-standing commitment to our customer's personal privacy. Any information we collect relates only to our business with you.

**Nonpublic Personal Information**
In the course of processing and maintaining your insurance policy, Great Western may collect nonpublic personal information about you from your application and other forms, from your transactions with us, and from our agents or affiliates. This information includes name, address, Social Security Number, and beneficiary designations.

**Nondisclosure of Nonpublic Personal Information**
We do not give or sell any nonpublic personal information about our customers or former customers to anyone, except as permitted by law.

**Restricted Access to Nonpublic Personal Information**
Furthermore, we restrict access to nonpublic personal information about you to only those employees who need to know that information in order to provide products or services to you.

**Nondisclosure of Personal Health or Medical Information**
We do not give or sell personal health or medical information about you, except as permitted by law or upon your written authorization.

**Safeguard Nonpublic Personal Information**
We maintain physical, electronic and procedural safeguards that comply with federal regulations to guard your nonpublic personal information.

Be assured that we respect your privacy and that we will continue to secure the information that you have entrusted to us.

PN-0418 FE                                                                                              43 115 4628 1018 US

## NOTICE OF PROTECTION PROVIDED BY
## MICHIGAN LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION

This notice provides a brief summary of the Michigan Life and Health Insurance Guaranty Association ("the Association") and the protection it provides to policyholders. This safety net was created under Michigan law, which determines who and what is covered and the amounts of coverage. The Association was established to provide protection in the unlikely event that your life, annuity or health insurance company becomes financially unable to meet its obligations and is taken over by its Insurance Department. If this should happen, the Association will typically arrange to continue coverage and pay claims, in accordance with Michigan law, with funding from assessments paid by other insurance companies.

The basic protections provided by the Association are:

Life Insurance
- o  $300,000 in death benefits
- o  $100,000 in cash surrender or withdrawal values

Health Insurance
- o  $500,000 in basic hospital, medical and surgical insurance benefits
- o  $300,000 in disability income insurance benefits
- o  $300,000 in long-term care insurance benefits

Annuities
- o  $250,000 in withdrawal and cash values

The maximum amount of protection for each individual, regardless of the number of policies or contracts, is $300,000, except that with regard to basic hospital, medical and surgical insurance benefits, the maximum amount that will be paid is $500,000.

**Note: Certain policies and contracts may not be covered or fully covered.** For example, coverage does not extend to any portion(s) of a policy or contract that the insurer does not guarantee, such as certain investment additions to the account value of a variable life insurance policy or a variable annuity contract. There are also various residency requirements and other limitations under Michigan law.

To learn more about the above protections, please visit the Association's website at www.milifega.org, or contact:

MICHIGAN LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION
1640 Haslett Road, Suite 160
Haslett, MI 48840-8683
Phone: (517) 339-1755

MICHIGAN OFFICE OF FINANCE AND INSURANCE REGULATION
P.O. Box 30220
Lansing, MI 48909
1-877-999-6442 or (517) 373-0220

**Insurance companies and agents are not allowed by Michigan law to use the existence of the Association or its coverage to encourage you to purchase any form of insurance. When selecting an insurance company, you should not rely on Association coverage. If there is any inconsistency between this notice and Michigan law, then Michigan law will control.**

01 114 3331 0910 MI

# INSURANCE POLICY/CERTIFICATE

pol-cov

# GREAT WESTERN INSURANCE COMPANY

**P.O. Box 14410, Des Moines, Iowa 50306-3410**
**For Inquiries Call Toll-Free 800-733-5454**
**or Email GWIC@americanenterprise.com**

### PLEASE READ YOUR POLICY CAREFULLY

This Policy is a legal contract between Great Western Insurance Company and the Owner. We will pay the proceeds provided by this Policy, subject to all the provisions of this and the following pages of this Policy. This Policy is issued in consideration of the Application and payment of the first premium.

### THIRTY DAY RIGHT TO EXAMINE POLICY

We want you to be satisfied with this Policy you have purchased. We urge you to examine it closely. If, for any reason, you are not satisfied, you may return this Policy to us or one of our agents within thirty days after you have received it.  We will cancel it and refund the entire premium including all fees you paid. If you return this Policy, this Policy will be considered void from the beginning and the parties shall be in the same position as if no policy had been issued.

This Policy is issued by

**GREAT WESTERN INSURANCE COMPANY**
At its Home Office
601 6th Avenue, Des Moines, Iowa 50309
A Stock Company

Thomas A. Swank, President          Margaret A. Brown, Assistant Corporate Secretary

**Whole Life Insurance Policy**
**Premiums Payable for Life of Insured Specified on Page Three**
Non-Participating

ICC21-FE-LB                                   1

GREAT WESTERN INSURANCE COMPANY
P.O. Box 14410, Des Moines, IA 50306-3410
For Inquiries Call Toll-Free 800-733-5454
WHOLE LIFE INSURANCE POLICY

POLICY DATA

**Policy Number:** 00GWF0079850

**Covered Person:** MARK W DOBRONSKI

**Owner:** MARK W DOBRONSKI

**Age Last Birthday:** 67

**Policy Date:** July 03, 2022        **Sex:** Male

**Loan Interest Rate:** 8%        **Premium Class:** Non-tobacco

**Face Amount:** $5,000        **Maturity or Expiration Date:** July 03, 2075

Schedule of Benefits and Premiums

| Form | Death Benefit | Annual Premium |
|---|---|---|
| ICC21-FE-LB, Whole Life Insurance Policy | $5,000 | $399.45 |
| ICC15-ACCEL-1219, Accelerated Death Benefit Rider | See Rider | Included |

| Optional Benefit Riders | | |
|---|---|---|
| ICC21-ADBR, Accidental Death Benefit Rider | $5,000 | $15.00 |

| | Annual | Semi-Annual | Quarterly | Monthly | Years Payable |
|---|---|---|---|---|---|
| Total Premium | $414.45 | $215.51 | $109.83 | $37.30 | 53 |

Annual Policy Fee of $40 is included in the premiums shown above.

Regulated by the Michigan Department of Insurance and Financial Services 1-877-999-6442

Whole Life Insurance Policy
Premiums Payable for Life of Insured Specified on Page Three
Non-Participating

ICC21-FE-LB        3

GREAT WESTERN INSURANCE COMPANY

TABLE OF DEATH BENEFITS, CASH, LOAN AND NONFORFEITURE VALUES

Per Face Amount From the Policy Data Page,

Interest for Nonforfeiture Values: 3.75%
Table of Mortality: 2017 Loaded CSO Smoker Distinct NON-TOBACCO          ,MALE  ,ALB
Reinstatement Interest Rate:      6%
Loan Interest Rate:               8%

Whole Life Insurance

Issue Age: 67

| End of Year | Death Benefit | Cash Value | Reduced Paid Up Amount | Extended Term Years | Days |
|---|---|---|---|---|---|
| 1 | $5,000 | $0 | $0 | 0 | 0 |
| 2 | $5,000 | $35 | $65 | 0 | 216 |
| 3 | $5,000 | $205 | $365 | 2 | 314 |
| 4 | $5,000 | $377 | $650 | 4 | 148 |
| 5 | $5,000 | $551 | $920 | 5 | 189 |
| 6 | $5,000 | $724 | $1,180 | 6 | 124 |
| 7 | $5,000 | $898 | $1,425 | 6 | 343 |
| 8 | $5,000 | $1,071 | $1,660 | 7 | 131 |
| 9 | $5,000 | $1,243 | $1,880 | 7 | 235 |
| 10 | $5,000 | $1,415 | $2,090 | 7 | 296 |
| 11 | $5,000 | $1,585 | $2,290 | 7 | 323 |
| 12 | $5,000 | $1,755 | $2,485 | 7 | 321 |
| 13 | $5,000 | $1,923 | $2,665 | 7 | 295 |
| 14 | $5,000 | $2,089 | $2,835 | 7 | 251 |
| 15 | $5,000 | $2,252 | $2,995 | 7 | 194 |
| 16 | $5,000 | $2,411 | $3,145 | 7 | 126 |
| 17 | $5,000 | $2,566 | $3,290 | 7 | 48 |
| 18 | $5,000 | $2,715 | $3,420 | 6 | 332 |
| 19 | $5,000 | $2,857 | $3,545 | 6 | 255 |
| 20 | $5,000 | $2,991 | $3,655 | 6 | 176 |

Whole Life Insurance Policy
Premiums Payable for Life of Insured Specified on Page Three
Non-Participating

ICC21-FE-LB                              4

GREAT WESTERN INSURANCE COMPANY
STATEMENT OF COST AND BENEFIT INFORMATION

| YEAR | ANNUAL PREMIUM | GUARANTEED DEATH BENEFIT | GUARANTEED CASH VALUE |
|---|---|---|---|
| 1 | $414.45 | $5,000 | $0 |
| 2 | $414.45 | $5,000 | $35 |
| 3 | $414.45 | $5,000 | $205 |
| 4 | $414.45 | $5,000 | $377 |
| 5 | $414.45 | $5,000 | $551 |
| 6 | $414.45 | $5,000 | $724 |
| 7 | $414.45 | $5,000 | $898 |
| 8 | $414.45 | $5,000 | $1,071 |
| 9 | $414.45 | $5,000 | $1,243 |
| 10 | $414.45 | $5,000 | $1,415 |
| 11 | $414.45 | $5,000 | $1,585 |
| 12 | $414.45 | $5,000 | $1,755 |
| 13 | $414.45 | $5,000 | $1,923 |
| 14 | $414.45 | $5,000 | $2,089 |
| 15 | $414.45 | $5,000 | $2,252 |
| 16 | $414.45 | $5,000 | $2,411 |
| 17 | $414.45 | $5,000 | $2,566 |
| 18 | $414.45 | $5,000 | $2,715 |
| 19 | $414.45 | $5,000 | $2,857 |
| 20 | $414.45 | $5,000 | $2,991 |
| AGE 60 | | | |
| AGE 65 | | | |

Benefit Disclosure:
  - Whole Life Insurance.
  - Cash Values are as of the end of the Policy year.


LIFE INSURANCE COST INDEX:   Life Insurance Cost Indexes are not applicable to this Policy.

FOOTNOTES:
1. For inquiries regarding this Policy summary please contact:

The Company's Home Office          or Your Agent
Great Western Insurance Company    KHONSAVAN VONGDARA
P.O. Box 14410                     339 SUMMER SPRINGS CT
Des Moines, IA 50306               JACKSONVILLE, FL 32225-4187
                                   904-314-0742


2. The maximum Policy loan interest rate is 8% charged in arrears.
3. This Policy is non-participating.
4. Covered Person:  MARK W DOBRONSKI                        734-330-9671
                    2634 ISLAND HILLS DR
                    DEXTER, MI 48130


Policy Number:  00GWF0079850              Date Prepared:  June 24, 2022
  Policy Form:  ICC21-FE-LB           Age Last Birthday:  67
   Plan Code:  FEL5
      Agency:  BLAKE HUNTER SCHEIFELE

# EXHIBIT 2

Action Required on your United of Omaha Application - DO NOT REPLY

From: PAUL CHRISTLE (donotreply@ipipeline.com)

To: redbaron2023@yahoo.com

Date: Monday, January 9, 2023 at 03:11 PM EST

 

Hello **Naven Johnson** (Proposed Insured HIPAA),

[Access your application and begin the eSignature process](#)

Your application is ready for your review. Please select the link above to be directed to your online application.

Once you have reviewed the information for accuracy, you may apply your eSignature by following the instructions on the screens.

If you have any questions, please do not hesitate to contact me at PAUL.CHRISTLE@GMAIL.COM.

Thank you for allowing me to handle your financial needs.

Regards,
**PAUL CHRISTLE**

**Having trouble viewing the images in this email?**

Your email provider may have prevented the automatic download of some images contained in this message. You may manually adjust your settings to allow the images to display, or Click Here to be directed to your online application.

If you are viewing this message from within your Junk or Spam folder, you may be required to move the message to your inbox.

# UNITED OF OMAHA LIFE INSURANCE COMPANY

A MUTUAL OF OMAHA COMPANY

Mutual of Omaha Plaza, Omaha, NE 68175



738528-15054363

## Application for Individual Life Insurance

### PROPOSED INSURED

| Name (First, Middle Initial, Last)<br>Naven Johnson | Sex<br>☒ Male ☐ Female | Height<br>5'   9" | Weight<br>165 | Social Security No.<br>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 |
|---|---|---|---|---|

| Home Address (Street, City, State, Zip)<br>9907 8th St Apt 7 Gotha, FL 34734-7000 | State of Birth<br>MI | Date of Birth<br>07/15/1955 | Age<br>67 |
|---|---|---|---|

| Phone No.<br>(407) 777-0222 | E-mail redbaron2023@yahoo.com | Driver's License No.<br>j525622552551 | Driver's License State<br>FL |
|---|---|---|---|

| Are you a legal resident of the United States?  ☒ Yes  ☐ No<br>(If "No", you are not eligible for coverage.) | In the past 12 months, has the Proposed Insured used any form of tobacco or nicotine replacement therapy? ☐ Yes  ☒ No |
|---|---|

(Optional)- Secondary Addressee: To help make sure your policy stays in force, you can have the person listed below receive a notice when your policy is past due and has not been paid.
Name _____  Address _____

### OWNER (Complete only if Owner/Applicant is different from Proposed Insured)

| Name of Policyowner (First, Middle Initial, Last) | Relationship to Proposed Insured |
|---|---|

| Policyowner Address (Street, City, State, Zip) | Phone No. | Social Security No. |
|---|---|---|

| Sex<br>☐ Male ☐ Female | Date of Birth | Age | E-mail | Citizenship Country |
|---|---|---|---|---|

### UNDERWRITING

**Part One   IF THE PROPOSED INSURED ANSWERS "YES" TO ANY QUESTIONS IN PART ONE, THAT PERSON IS NOT ELIGIBLE FOR ANY COVERAGE UNDER THIS APPLICATION.**

| | |
|---|---|
| **1.**  Is the Proposed Insured currently:<br>**(a)** bedridden or confined to any hospital, nursing home, long-term care facility or skilled nursing facility; or receiving or been advised by a licensed member of the medical profession to receive care in a nursing home, hospice care, or home health care? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>**(b)** requiring assistance with activities of daily living such as taking medications, bathing, dressing, eating, toileting, getting in and out of a chair or bed, or control of bowel or bladder problems? . . . . . . . . . . . . . . . . . .<br>**(c)** requiring any of the following (other than for fractures, bone or joint surgery, including replacement): wheelchair, electric scooter, or oxygen equipment to assist breathing (excluding use for sleep apnea)? . . . . . . | ☐ Yes ☐ No<br><br>☐ Yes ☐ No<br><br>☐ Yes ☐ No |
| **2.**  Has the Proposed Insured **ever been:**<br>**(a)** tested positive for exposure to the HIV infection HIV antibodies in a test taken for the purpose of obtaining insurance or been diagnosed by a physician as having ARC or AIDS caused by the HIV infection or other sickness or condition derived from such infection?. . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>**(b)** diagnosed with, been treated for or advised by a physician or health care provider to receive treatment for Alzheimer's Disease, Dementia, Huntington's Disease, Sickle Cell Anemia, Myelodysplastic Syndrome (MDS), Lou Gehrig's Disease (ALS), Quadriplegia, Paraplegia, Down's Syndrome, mental incapacity, congestive heart failure, Cirrhosis, Metastatic Cancer or recurrent Cancer of the same type?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>**(c)** diagnosed with insulin shock, diabetic coma, or had an amputation due to diabetic complications or diagnosed by a licensed member of the medical profession with End Stage Renal Disease or requiring dialysis?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>**(d)** advised by a licensed member of the medical profession to receive or have received an organ or bone marrow transplant? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>**(e)** diagnosed by a physician or health care provider as having a terminal medical condition that is expected to result in death within the next 12 months?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ Yes ☐ No<br><br><br>☐ Yes ☐ No<br><br><br>☐ Yes ☐ No<br><br>☐ Yes ☐ No<br><br>☐ Yes ☐ No |
| **3.**  In the past 12 months, has the Proposed Insured been:<br>**(a)** advised by a physician to have a surgical operation, diagnostic testing other than for routine screening purposes or for those related to HIV/AIDS, treatment, hospitalization, or other procedure which has not been done or for which results are not known? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .<br>**(b)** diagnosed by a physician or health care provider as having heart disease or heart surgery of any kind?. . . | ☐ Yes ☐ No<br>☐ Yes ☐ No |
| **4.**  In the past 2 years, has the Proposed Insured been diagnosed with, been treated for or advised by a physician or health care provider to receive treatment for any form of cancer (except basal or squamous cell skin cancer)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | ☐ Yes ☐ No |

T087LFL14A

**Part Two** **IF THE PROPOSED INSURED ANSWERS "YES" TO ANY QUESTION IN PART TWO, THAT PERSON IS ELIGIBLE ONLY FOR THE GRADED BENEFIT PRODUCT.**

**5.** Has the Proposed Insured **ever** (a) received care or treatment for, or (b) been advised by a physician or health care provider to seek treatment for:

**(a)** Diabetes before age 50 or diabetes at any age with complications of Retinopathy (eye), Nephropathy (kidney), Neuropathy (nerve) or Peripheral Vascular Disease (PVD or PAD)? . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**
**(b)** Hepatitis C? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**
**(c)** Chronic Lung Disease, including Chronic Obstructive Pulmonary Disease (COPD), Chronic Bronchitis, Emphysema, or Sarcoidosis? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**6.** **In the past 4 years,** has the Proposed Insured: (a) received care or treatment for, or (b) been advised by a physician or health care provider to seek treatment for:

**(a)** Cancer, Leukemia, Melanoma or any other internal cancer (except basal or squamous cell skin cancer)? . . . ☐ **Yes** ☐ **No**
**(b)** Chronic Kidney Disease, Systemic Lupus or Scleroderma? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**
**(c)** Bipolar Depression, Schizophrenia, Parkinson's Disease or Multiple Sclerosis? . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**7.** **In the past 2 years,** has the Proposed Insured: (a) received care or treatment for, or (b) been advised by a physician or health care provider to seek treatment for:

**(a)** Coronary Artery Disease, Heart Attack, Coronary Artery Bypass Surgery, Angioplasty, Cardiomyopathy, irregular heart rhythm, or Valvular Heart Disease with surgical repair or replacement? . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**
**(b)** Stroke or Transient Ischemic Attack (TIA)? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**8.** **In the past 2 years,** has the Proposed Insured:

**(a)** been convicted of, incarcerated for or currently awaiting trial for a felony? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**
**(b)** been treated for or advised by a licensed member of the medical profession to have treatment for alcohol or drug abuse or convicted more than once of reckless driving or driving under the influence of drugs or alcohol?. ☐ **Yes** ☐ **No**
**(c)** used unlawful drugs in any form or abused or misused prescription drugs? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**9.** **In the past 2 years,** has the Proposed Insured been hospitalized by a physician or health care provider for any mental or nervous disorder? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☐ **No**

**10.** **In the past 12 months,** has the Proposed Insured consulted a physician for chronic cough, <u>unexplained</u> weight loss greater than 10 pounds, fatigue or unexplained gastrointestinal bleeding?. . . . . . . ☐ **Yes** ☐ **No**

**NOTE: If the Proposed Insured answers all above questions "No", that person is eligible for the Level Benefit Product.**

**OPTIONAL COMMENTS (Not Required) -** Provide any additional information available.
Exclude any information regarding treatment for HIV/AIDS/ARC.

| Question Number | Details to Underwriting Questions (Diagnosis, Dates, Durations, Medications, Dosages) |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

T087LFL14A

## PLAN INFORMATION

| Plan: | Rider: (Only if selecting Level Benefit Product) |
|---|---|
| ☒ Level Benefit Product ☐ Graded Benefit Product | ☐ Accidental Death Rider |
| Amount Applied For $20,000 | |

Payment Mode:

☐ Annual ☐ Semiannual ☐ Quarterly ☐ **Monthly** (Automated Bank Account Withdrawal)

Modal Premium $_____ Collected Premium $_____

## BENEFICIARY (If more space is needed, list on a separate sheet)

| Primary Beneficiary | Relationship to Insured | Date of Birth |
|---|---|---|
| Contingent Beneficiary | Relationship to Insured | Date of Birth |

## OTHER COVERAGE INFORMATION

1. Does the Proposed Insured have any pending applications or existing life insurance or annuity contracts with the company or any other company? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No

2. Is the insurance applied for intended to replace or change any life insurance or annuity contract in force with the company or any other company? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ Yes ☒ No
If "Yes" to questions #1 or #2, please give details below. If more space is needed, list on a separate sheet.

| Company | Proposed Insured | Face Amount | To be Replaced or Converted? |
|---|---|---|---|
| | | | ☐ Yes ☐ No |
| | | | ☐ Yes ☐ No |

## AUTHORIZATION and AGREEMENT

**Authorization:** I authorize any medical provider, hospital, clinic, pharmacy, pharmacy benefit manager, or other medical care facility, MIB, Inc. (MIB), state department of motor vehicles and other entities processing motor vehicle records, insurance companies or consumer reporting agencies to release information about me or my health, such as, medical history, including the presence of HIV infection, AIDS or ARC, mental or physical condition, prescription drug records, drug or alcohol use, driving record or insurance claims information, to ""United of Omaha Life Insurance Company ("United of Omaha"). The information will be used to determine my eligibility for insurance or to resolve or contest any issues of incomplete, incorrect or misrepresented information on this application that may arise. I also authorize United of Omaha to disclose information to MIB. I understand that my information received by MIB may be disclosed, upon request, to another member company with whom I apply for life or health insurance or to whom I may submit a claim for benefits. If the person or entity to whom information is disclosed is not a health care provider or health plan subject to federal privacy regulations, the information may be redisclosed without the protection of the federal privacy regulations. This authorization is valid for 24 months from the date signed. I may refuse to sign this authorization but if I refuse, the insurance I am applying for will not be issued. I may revoke this authorization at any time by written notice to the address below. This revocation is limited to the extent that United of Omaha has taken action in reliance on the authorization or the law allows United of Omaha to contest the issuance of the policy or a claim under the policy. I will receive a copy of this authorization.

**Agreement:** To the best of my knowledge and belief, I represent the information above is true and complete. Any incorrect or misleading answers may void this application and any issued policy effective the issue date. Unless otherwise provided under a conditional receipt, I understand that no insurance shall take effect until all outstanding application requirements have been received, a policy is issued and the first premium is received by United of Omaha during the Proposed Insured's lifetime. The issue date of the policy will be the date shown on the policy, even though coverage may not become effective until a later date. You must immediately notify United of Omaha if there has been a change in the Proposed Insured's health or habits that will change any statement or answer to any question in the application as of the date the policy is delivered. No policy of any kind will be in effect if the Proposed Insured dies or is otherwise ineligible for the insurance for which they applied. No producer can waive or change any receipt or policy provision or agree to issue any policy.

T087LFL14A

**- CONTINUED ON NEXT PAGE -**



**Fraud Warning: Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.**

**If applying for the Graded Benefit Product:** I understand that a reduced death benefit amount is payable during the first two policy years if death results from sickness or other natural causes. The full face amount is payable during the first two policy years if death results from an accident.

Signed at: _____

     City                         State

_____     Date: _____

Signature of Proposed Insured

_____     Date: _____

Signature of Applicant/Owner/Trustee (if Other Than Proposed Insured)

## Agent Statement:

By signing below, I/we, the Agent(s), hereby agree that I/we know of nothing detrimental to the risk that is not recorded in this application.

1. I/We certify that, during an interview with the Proposed Insured, I/we asked each question exactly as written and recorded the answers provided by the Proposed Insured(s) completely and accurately. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes**  ☐ **No**

2. Do you, the Agent(s), have any reason to believe the policy applied for has replaced or will replace any insurance policy or annuity contract in force with the company or any other company? . . . . . . . . . . . . . . . . . . . ☐ **Yes**  ☐ **No**

3. Has the Proposed Insured informed you, the Agent(s), that he/she has any pending or existing life insurance or annuity contracts with the company or any other company?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes**  ☐ **No**

**(If the above questions are answered "Yes," fulfill all state and company requirements.)**

4. Are you related to the Proposed Insured or Owner? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes**  ☐ **No**

If "Yes," state relationship _____

5. How long have you known the Proposed Insured? _____

6. How long have you known the Proposed Owner? _____

7. Previous residence of Proposed Insured for the past five years.

| Street Address | City | State | Zip Code |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

8. I conducted said interview in person . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes**  ☐ **No**

If "No," please explain _____

|  | PAUL.CHRISTLE@GMAIL.COM | 1060327     100% |  |
|---|---|---|---|
| Signature of Agent #1 | Agent E-mail | Production Number | Date |
| Signature of Agent #2 | Agent E-mail | Production Number | Date |
| FL | | | |
| Florida License ID Number, Agent #1 | Florida License ID Number, Agent #2 | | |
| PAUL CHRISTLE | | FAMILY FIRST LIFE | |
| Print Agent #1 Name    FL | Print Agent #2 Name | Agency Name | |

T087LFL14A

T087LFL14A        **PLEASE SUBMIT ALL PAGES**

**Authorization:** I authorize any medical provider, hospital, clinic, pharmacy, pharmacy benefit manager, or other medical care facility, MIB, Inc. (MIB), state department of motor vehicles and other entities processing motor vehicle records, insurance companies or consumer reporting agencies to release information about me or my health, such as, medical history, including the presence of HIV infection, AIDS or ARC, mental or physical condition, prescription drug records, drug or alcohol use, driving record or insurance claims information, to""United of Omaha Life Insurance Company ("United of Omaha"). The information will be used to determine my eligibility for insurance or to resolve or contest any issues of incomplete, incorrect or misrepresented information on this application that may arise. I also authorize United of Omaha to disclose information to MIB. I understand that my information received by MIB may be disclosed, upon request, to another member company with whom I apply for life or health insurance or to whom I may submit a claim for benefits. If the person or entity to whom information is disclosed is not a health care provider or health plan subject to federal privacy regulations, the information may be redisclosed without the protection of the federal privacy regulations. This authorization is valid for 24 months from the date signed. I may refuse to sign this authorization but if I refuse, the insurance I am applying for will not be issued. I may revoke this authorization at any time by written notice to the address below. This revocation is limited to the extent that United of Omaha has taken action in reliance on the authorization or the law allows United of Omaha to contest the issuance of the policy or a claim under the policy. I will receive a copy of this authorization.

Producer Contact Information
    Office Phone Number: 5614209620
    Office Fax Number: 5614209620
    Email Address: PAUL.CHRISTLE@GMAIL.COM



| | |
|---|---|
| Underwritten by<br>United of Omaha Life Insurance Company<br>A Mutual of Omaha Company | 3300 Mutual of Omaha Plaza<br>Omaha, Nebraska 68175 |

## ACCELERATED DEATH BENEFIT RIDER DISCLOSURE

**The benefit received under the rider may be taxable. Receipt of the accelerated death benefit may adversely affect your eligibility for Medicaid or other government benefits or entitlements. You should consult your personal tax advisor or the Social Security Administration before requesting the benefit.**

This disclosure is a brief description of the Accelerated Death Benefit for Terminal Illness or Chronic Illness Rider and its effects on your policy. This disclosure is not an insurance contract, but only a summary of the coverage provided by the rider. There is no premium or cost of insurance charge for the rider.

### BENEFIT DESCRIPTION

While the rider is in force and the insured has a terminal illness or is chronically ill, you may elect to receive the accelerated death benefit before the insured dies. A terminal illness is a medical condition that will result in the insured's death within 12 months. Chronically ill means that the insured person is unable to perform at least two activities of daily living (ADL's) without substantial assistance from another person. A physician must certify that the insured has a terminal or chronic illness.

The amount available for the accelerated death benefit is your policy's death benefit. You may receive the accelerated death benefit only once.

For a terminal illness, we will reduce the accelerated death benefit by 6%.

For a chronic illness, we will reduce the accelerated death benefit by the chronic illness confinement factor. The chronic illness confinement factor varies by policy year as shown in the rider. We will also reduce the accelerated death benefit by a $100 charge and by the amount of any loans and unpaid premiums.

### EFFECT OF THE ACCELERATED DEATH BENEFIT ON THE POLICY

The rider will terminate when the accelerated death benefit is paid.

**NOTE:** If the policy is issued as a graded death benefit, the accelerated death benefit is not available.

### Acknowledgment

I acknowledge receipt of this disclosure form.

_____          _____
Applicant/Owner Signature                                      Date

I have provided this disclosure form to the applicant/owner.

_____          _____
Producer Signature                                              Date



Applicant's Copy                                                           L8535

 **Mutual of Omaha**

Underwritten by
United of Omaha Life Insurance Company
A Mutual of Omaha Company

3300 Mutual of Omaha Plaza
Omaha, Nebraska 68175

## ACCELERATED DEATH BENEFIT RIDER DISCLOSURE

**The benefit received under the rider may be taxable. Receipt of the accelerated death benefit may adversely affect your eligibility for Medicaid or other government benefits or entitlements. You should consult your personal tax advisor or the Social Security Administration before requesting the benefit.**

This disclosure is a brief description of the Accelerated Death Benefit for Terminal Illness or Chronic Illness Rider and its effects on your policy. This disclosure is not an insurance contract, but only a summary of the coverage provided by the rider. There is no premium or cost of insurance charge for the rider.

### BENEFIT DESCRIPTION

While the rider is in force and the insured has a terminal illness or is chronically ill, you may elect to receive the accelerated death benefit before the insured dies. A terminal illness is a medical condition that will result in the insured's death within 12 months. Chronically ill means that the insured person is unable to perform at least two activities of daily living (ADL's) without substantial assistance from another person. A physician must certify that the insured has a terminal or chronic illness.

The amount available for the accelerated death benefit is your policy's death benefit. You may receive the accelerated death benefit only once.

For a terminal illness, we will reduce the accelerated death benefit by 6%.

For a chronic illness, we will reduce the accelerated death benefit by the chronic illness confinement factor. The chronic illness confinement factor varies by policy year as shown in the rider. We will also reduce the accelerated death benefit by a $100 charge and by the amount of any loans and unpaid premiums.

### EFFECT OF THE ACCELERATED DEATH BENEFIT ON THE POLICY

The rider will terminate when the accelerated death benefit is paid.

**NOTE:** If the policy is issued as a graded death benefit, the accelerated death benefit is not available.

### Acknowledgment

I acknowledge receipt of this disclosure form.

_____
Applicant/Owner Signature

_____
Date

I have provided this disclosure form to the applicant/owner.

_____
Producer Signature

_____
Date



Company's Copy

L8535

# *Third Party Notice*


**Mutual** *of* **Omaha**

You have the right to designate a person, in addition to yourself, to receive notice that your premium is past due and has not been paid. This extra notice will be sent at least 21 days prior to the effective date of cancellation of your policy or certificate only if you are age 64 or older. This notice will state the amount of premium, the date by when the premium must be paid and the date on which coverage terminates. You can designate this additional person to receive notice of nonpayment now or at a later time, provided the policy is in force, and you give us written notice containing the additional person's name and address.

You have the right to change this third-party designation at any time; however, you must submit the change in writing to the address below.

PLEASE COMPLETE EITHER SECTION 1 OR SECTION 2 AND RETURN TO US.

## Section 1

I wish to designate an additional person to receive notice of nonpayment of premium.

Policyowner/Certificateholder: Naven Johnson

Policy Number: _____

Date: 01/09/2023

Third Party: _____
(Please print name of other person to receive notice of nonpayment)

Third Party Address: _____
(Street Address)          (City)          (State)          (Zip)

Signature of Policyowner/Certificateholder

_____

Date_____

## Section 2

I do not wish to designate an additional person to receive notice of nonpayment of premium.

Signature of Policyowner/Certificateholder

_____

Date_____

UNITED *of* OMAHA LIFE INSURANCE COMPANY  Attn: Individual Life Underwriting  9330 State Hwy 133, Blair, 68008

L2401_0604